---

133

M. GOMEZ

1
2  sergeant, were you calling out for a
3  specific sergeant or just calling a
   sergeant?
   A.   Yes, just calling a sergeant.
6  Q.   Did Lieutenant Hayes say
7  anything else to you other than what you've
8  already told us?
9  A.   No.
10 Q.   Other than Lieutenant Hayes and
11 the other police officers that we've talked
12 about, did you have any conversation or did
13 any other police officer speak to you during
14 this time?
15 A.   Oh, during this time, no, no.
16 Q.   You are suing several
17 individual police officers in this case,
18 right, that you've named several individual
19 police officers?
20 A.   Yes.
21 Q.   Why are you suing Officer
22 D'Allesandro?
23       MR. YOUNG:  Why is he suing?  I
24       put together the pleadings.  He did
25       not put together the pleadings.  I

---

134

M. GOMEZ

1
2  can tell you why we're suing Officer
3  D'Allesandro.
4        MS. SHERVEN:  With all due
5        respect, you're not here for a
6        deposition.  I'm sure that Mr. Gomez
7        can tell us why he believes he's
8        suing Officer D'Allesandro or any of
9        the other individuals.
10 Q.   What are you alleging that
11 Officer D'Allesandro did in this case?
12 A.   Well, from what I --
13       MR. YOUNG:  I know maybe more
14       than you know, so you can give them
15       to the extent that you know.
16 A.   From what I can understand
17 everything was put together by my Counsel,
18 and I don't know specifically say anything
19 about Officer D'Allesandro.  But the one
20 that really --
21       MR. YOUNG:  -- she's just
22       asking D'Allesandro not.  She'll go
23       one by one.
24       THE WITNESS:  Okay.
25 Q.   Did you review the Complaint or

---

135

M. GOMEZ

1
2  read the Complaint that your attorney put
3  together in this case at any time?
4  A.   Yes, I believe I did, right,
5  yes.
6  Q.   Well, why do you believe that
7  Officer D'Allesandro is named in this case?
8        MR. YOUNG:  I know why.  She's
9        asking you.
10 A.   Okay, I guess it was through
11 the description of my Counsel to put, advice
12 of my Counsel's to.
13 Q.   I'm not asking you about any
14 conversations that you had with your
15 attorney.  So I'm not asking about any
16 privileged conversations with your attorney
17 I'm just asking you.  It's not a trick
18 question.  I'm just asking you.
19 A.   I'm trying to come up with a
20 good answer.
21 Q.   Why?  What do you believe that
22 Officer D'Allesandro did wrong in this case,
23 maybe, that's a better way of asking it?
24 I'm just trying to find out why he's
25 personally name?

---

136

M. GOMEZ

1
2  A.   No.  I don't believe he did
3  anything wrong actually, no.
4  Q.   You've also sued or named in
5  this case Lieutenant Barry Campbell.  Why do
6  you believe that he is named in this
7  lawsuit?  Why are you suing him?
8  A.   Well, Lieutenant Barry Campbell
9  was the officer assigned on the next shift,
10 which is the one that was that was the
11 morning shift.  And Lieutenant Barry
12 Campbell was aware of the situation between
13 my daughter and Detective Quinoy.  He was
14 not there during the incident, he was not
15 there for the incident.
16 Q.   Did you see Lieutenant Campbell
17 at any time from the time that you arrived
18 at the police station until the time you
19 were taken to the hospital?
20 A.   No, not at that time.  Later.
21 Q.   Later, when you came back from
22 the hospital; is that what you're inferring?
23 A.   You want me to keep answering.
24 I saw him the next morning when I was going
25 to bring -- they were taking me to the jail,

137

M. GOMEZ

1  M. GOMEZ
2  to the County.
3     Q.   You didn't see him at all until
   that point in time; is that right?
   A.   Right.
6     Q.   Did you hear his voice at any
7  time, or have any reason to believe that he
8  was at the police station?
9     A.   That night during?
10    Q.   Right.
11    A.   No.   No.
12    Q.   Well, what do you believe that
13 Lieutenant Campbell did wrong?
14    A.   Can I ask him a question?
15    Q.   No.   There's a question
16 pending.
17    A.   I'm sorry.   Well, Lieutenant
18 Campbell actually didn't do anything wrong,
19 but he knows of the situation between my
20 daughter and Detective Quinoy, which he is a
21 married man, put him in a position of being
22 liable for in the case.
23    Q.   Well, what do you believe that
24 he knew about the situation with your
25 daughter and Detective Quinoy?

138

M. GOMEZ

1  M. GOMEZ
2     A.   No.   He knew they were going
3  out.   That's pretty much it.
4     Q.   Had you had some conversation
5  with Lieutenant Campbell before you were
6  arrested that leads you to believe that he
7  knew something?
8     A.   Well, also to be honest with
9  you, there was quite a few people that came
10 forward, because they did the investigation
11 at the beginning of the case back in
12 October, and there was a witness that came
13 forward and told Lieutenant Barry Campbell
14 that she saw when Detective Quinoy kicked me
15 in my face when I was sitting down cuffed
16 already in the patrol car.
17       When my criminal court attorney
18 did the open file discovery, the name of
19 that lady did not appear in what the police
20 presented, so her name was taken out.
21       It was Lieutenant Campbell was
22 responsible for that investigation.   That
23 name shouldn't have been taken out.
24    MS. SHERVEN:   Let me move to
25 strike the portions that were

139

M. GOMEZ

1  M. GOMEZ
2  nonresponsive to the question.
3     MR. YOUNG:   Well, I think it
4  is.   Off the record.
5     (Off-the-record discussion.)
6     Q.   Just so I'm clear because I
7  don't think you answered my last question
8  specifically.   Did you have some
9  conversation with Lieutenant Campbell which
10 leads you to believe that he knew something
11 about the relationship or between Detective
12 Quinoy and your daughter?
13    A.   Yes.   Right before I was being
14 transported, I saw a little bit before, I
15 think it was either before I saw the Judge
16 that morning or after.   I was already
17 shackled up, and I was waiting to get
18 transported to the jail.   He came to the
19 printing room, which I was sitting there,
20 and he asked me, hey, Mario, what happened.
21       I said, Barry, this is what
22 happened.   I give him a brief rundown of the
23 situation with Quinoy.   He said, Mario, what
24 are you talking about?   I used to see them
25 together all the time.   They look so

140

M. GOMEZ

1  M. GOMEZ
2  innocent together.   That was his answer.
3     After that, he left.   He said I
4  be back.   He never came back.   I never saw
5  him again.
6     Q.   I'm going to stop you there.
7  Other than that conversation with Lieutenant
8  Campbell, did you have some conversation
9  with him before you were arrested that leads
10 you to believe that he knew anything about
11 your daughter and Detective Quinoy?
12    A.   No.   No.
13    Q.   Is that the only conversation
14 that you had with Lieutenant Campbell that
15 leads you to believe that he knew something
16 about your daughter and Detective Quinoy?
17    A.   Yes.
18    Q.   Now, you mentioned an
19 investigation.   Is it your understanding
20 that Lieutenant Campbell was somehow
21 involved in an internal or a Police
22 Department investigation?
23    A.   Yes.   He was assigned the
24 investigation.   And he called my -- after I
25 came out from jail, and he called my house

141

M. GOMEZ

2 quite a few times for me to come and give
3 statement in the Police Department.
4    Q.   During those occasions that he
5 called your house, did you actually speak
6 with him, or did he leave messages?
7    A.   He left messages.  I was
8 already under the instruction by my attorney
9 not to respond to his call.
10    Q.   You're referring to your
11 criminal court attorney?
12    A.   Yes.
13    Q.   Which attorney was that at that
14 time?
15    A.   I remember my wife's attorney.
16 I can't remember my attorney.
17    Q.   You're currently represented by
18 Angel Perez; is that correct?
19    A.   Yes.
20    Q.   And it was not --
21    A.   -- no, it was not Angel at the
22 beginning, no.
23    Q.   At any point in time did you
24 return a phone call from one of the messages
25 that Lieutenant Campbell left?

142

M. GOMEZ

2    A.   No.
3    Q.   Did your wife do so?
4    A.   No.  I don't think so, no.
5    Q.   At any point in time did you
6 speak with Lieutenant Campbell other than
7 what you already told us about before you
8 went to see the Judge about the facts of
9 this case?
10    A.   No.
11    Q.   Is there any other reason other
12 than what you've just told us about
13 Lieutenant Campbell or any other reasons why
14 you believe that he is named in this
15 lawsuit?
16    A.   No, that's it.
17    Q.   Now, you've also named a
18 Lieutenant Gabriel Hayes, Michael Hayes'
19 father, correct?
20    A.   Yes.
21    Q.   What do you believe that
22 Lieutenant Hayes did wrong?
23    A.   Actually, I don't know if he
24 did anything wrong.  I'm not sure, you know.
25    Q.   Well, other than when you saw

143

M. GOMEZ

2 him I guess during the booking process, did
3 you see him any other time that night?
4    A.   No.
5    Q.   You also named Sergeant Wood,
6 is that actually Sergeant Hood?
7    A.   Hood, yes.
8    Q.   Do you know Sergeant Hood?
9    A.   Personally?
10    Q.   Personally.
11    A.   No.
12    Q.   Would you recognize him?
13    A.   Sure.
14    Q.   Did you see Sergeant Hood at
15 all the night of your arrest?
16    A.   Yes.
17    Q.   When did you see him?
18    A.   Inside the precinct, inside the
19 station.
20    Q.   Did you see him at all outside
21 of the police station?
22    A.   No.
23    Q.   Did you have any conversation
24 with Sergeant Hood when you were inside the
25 police station?

144

M. GOMEZ

2    A.   Yes, I believe that I can't
3 remember what, but I did spoke to him a few
4 times.
5    Q.   Can you remember generally what
6 your conversations were with him?
7    A.   It was generally that one time
8 he was passing by and, you know, I was
9 waiting to get transported, and one of my
10 cuffs was really -- I couldn't.  I was going
11 to lose -- I lost all circulation on how
12 tight it was.
13         MR. YOUNG:  Indicating on the
14    right wrist.
15    A.   Yes.  And I said, Sergeant.  I
16 saw him walking around.  Please, can you
17 have somebody loosen my cuff?  Yes, a little
18 bit.  I know what happened.  Yes, I
19 understand, but I'm going to lose my fingers
20 or something.  That's what I told him.
21    Q.   Did he respond to you in any
22 way?
23    A.   No.  He kept walking.  I mean
24 he was busy, but he didn't, like, so, now,
25 sometimes you look.  You continue what

145

M. GOMEZ

2  you're doing. That's pretty much it.

3      Q.  Did he give you any indication
that he had heard you?

5      A.  No, not that I know.

6      Q.  Did you say anything else to
7  him?

8      A.  No. I know I spoke to him. I
9  don't know. I can't remember when I was
10 being transported or some of the questions.
11 I can't remember what question he asked him,
12 but he asked me but he asked me some type of
13 question, and I answered him.

14      Q.  Just so we're clear, when was
15 this that you saw Sergeant Hood; was this
16 before or after you were taken to the
17 hospital?

18      A.  Before and after. He was
19 there, yes.

20      Q.  What do you believe that
21 Sergeant Hood did wrong?

22      A.  Well, I believe Sergeant
23 Hood --

24      MR. YOUNG:  -- other than what
25      he's already testified to.

---

146

M. GOMEZ

2      A.  Sergeant Hood being that he was
3  one of the sergeants in charge of the shift
4  failed to come out and see that he
5  supervised his officers as to what happened
6  and tell them to stop. There's a certain
7  point that they have to come and stop, and
8  you know when you're making an arrest.

9      Q.  What leads you to believe that
10 he was the sergeant in charge that night?

11      A.  From what.

12      MR. YOUNG:  -- can you just go
13      back to his answer. Did he use that
14      term "sergeant in charge"?

15      THE WITNESS:  Yes, I shouldn't
16      say that.

17      MR. YOUNG:  Because he also
18      used the word "supervise". I just
19      want to make sure.

20      (Whereupon, the reporter read
21      back the requested material.)

22      Q.  Do you remember the question?

23      A.  Yes. So, you want me to keep
24 answering?

25      Q.  What leads you to believe that

---

147

M. GOMEZ

2  he was a sergeant in charge?

3      A.  Also, there was the part when
4  my wife was come back from the hospital, she
5  got arrested. Detective Quinoy came out and
6  arrested her. And during the time that she
7  was getting printed and booked in and being
8  asked all the questions in Detective
9  Quinoy's office, my daughter came in asking
10 Sergeant Hood, do you know where my mom is.
11 And he said, no, I have no idea. And she
12 said I hope you guys didn't get arrested,
13 because that would be the icing on the cake.

14      And he also knew that she was
15 arrested, and he was lying to my daughter
16 giving her the wrong information. He should
17 have said, yes, your mom got arrested.
18 That's it.

19      MS. SHERVEN:  I move to strike
20      that as nonresponsive.

21      A.  Well, I'm giving you one more
22 of the things that I believe.

23      Q.  I'm just trying to get to why
24 do you believe that he was in charge that
25 night or a sergeant in charge?

---

148

M. GOMEZ

2      A.  One of the supervisors?

3      Q.  Yes, yes, one of the
4  supervisors or sergeants.

5      A.  Because I believe that he was
6  there during the time of the arrest, the
7  incident was happening outside.

8      Q.  But you didn't see him outside
9  during the incident?

10      A.  No. No.

11      Q.  Did anyone ever tell you that
12 he was, I don't know a supervising sergeant?

13      A.  I believe my wife did, yes.

14      Q.  How did your wife come to learn
15 that Sergeant Hood was the supervising
16 officer that night?

17      A.  Because she went three times
18 into the main station when they have the
19 glass and the officers ask you the questions
20 outside. And she saw the sergeant and the
21 other officer there.

22      Q.  Do you believe that Sergeant
23 Hood did anything else wrong?

24      A.  No. No. No.

25      Q.  Now, you've also named in this

149

M. GOMEZ

1    lawsuit the Chief of Police Jimmy Warren.
2    What do you believe that he did wrong?
3         A.   I believe that this situation,
4    this whole situation that happened not only
5    mine but a lot of things in the Village of
6    Sleepy Hollow due to the lack of supervision
7    by the Chief of Police. He's definitely
8    responsibility to what happened to me and my
9    family.
10        Q.   What do you believe that he did
11   wrong, though?
12        A.   Well, he was not there, but he
13   was in the hospital with Detective Quinoy
14   during the time that Detective Quinoy was
15   getting treatment.
16        Q.   Were you finished with your
17   answer or?
18        A.   Well, I was waiting for you to
19   keep going. You want me to continue in the
20   same answer everything that I know?
21        Q.   If you have something else to
22   add, then go ahead. But I'm asking you
23   specifically what you believe that the Chief
24   of Police, Chief Warren, what he did wrong?

150

M. GOMEZ

1         MR. YOUNG:   Because I know
2         where this is going. Let me try and
3         make it as easy as possible. Why
4         don't you start going back
5         chronologically by the high school.
6         I think that's the earliest one.
7         MS. SHERVEN:   For the record,
8         though, I don't appreciate that
9         you're coaching the Witness.
10        MR. YOUNG:   I'm not coaching.
11        A.   Then I will do -- you want the
12   whole answer. It might take a little while.
13        Q.   I'm just going to ask you then
14   we'll followup to this?
15        A.   To Jimmy Warren?
16        Q.   I'm asking you about Chief
17   Warren, you know Chief Warren, correct?
18        A.   Yes.
19        Q.   Was he physically present at
20   all during any of the incident that you've
21   described with the police during your
22   arrest, anything, did you see him?
23        A.   He was in the hospital.
24        Q.   But I'm not asking about the

151

M. GOMEZ

1    hospital.
2         A.   No, no, no, not during the
3    arrest or the incident, no, he was not. I
4    didn't see him at all, no.
5         Q.   Would you recognize Chief
6    Warren's voice if you heard it?
7         A.   Yes.
8         Q.   Did you hear his voice at all
9    while you were at the police station?
10        A.   I was all the way at the end.
11   There was a lot of people coming in and out.
12   There was Tarrytown Police came in, and he
13   had to be there. I know he was there.
14        Q.   How do you know that he was
15   there?
16        A.   I'm assuming that he was there.
17        Q.   Okay. You told us earlier that
18   you had heard Lieutenant Hayes' voice. Did
19   you hear Chief Warren's voice at any point
20   in time during the time you were in the
21   precinct?
22        A.   I'm pretty much I believe that
23   I heard his voice. I'm not sure if it was
24   his voice. I'm pretty sure.

152

M. GOMEZ

1         MR. YOUNG:   Don't guess.
2         A.   Don't guess. No, okay. Sorry.
3         MR. YOUNG:   Can I just take a
4         twenty-second break.
5         (Whereupon, a recess was
6         taken.)
7         Q.   I'm not clear on your last
8    answer. Just so we're clear and the record
9    is clear because I think it was a little
10   jumbled. Did you hear Chief Warren's voice
11   at all while you were at the police station?
12        A.   No, not that I can recall.
13        Q.   Now, you said that you know he
14   was at the hospital?
15        A.   Yes.
16        Q.   Did you actually see Chief
17   Warren at the hospital?
18        A.   No. My wife saw him.
19        Q.   Did your wife have any
20   conversation with Chief Warren while at the
21   hospital, and referring to Phelps Hospital,
22   right?
23        A.   Yes.
24        Q.   Did your wife have any

153

M. GOMEZ

2  conversation with him then?

3     A.   She did call him twice, Jimmy,
Jimmy because he knows her also.  And can I
talk to you one minute, please.  I want to
6  say something to you.  He went like this
7  with the hand.

8          MR. YOUNG:  Motioning away.

9     A.   Motioning away, pushing, okay.
10 Never came to even say a word to see what
11 was happening.

12    Q.   Did your wife tell you if she
13 saw Chief Warren at all any other time that
14 night?

15    A.   Any other time?

16    Q.   Any other time.

17    A.   No.

18    Q.   So, just that one time?

19    A.   Yes.

20    Q.   Did any other member of your
21 family try to talk to Chief Warren that
22 night?

23    A.   No, not that I can remember.
24 No.  I don't know if my daughter was trying.
25 I don't know.  No, she was not there during

154

M. GOMEZ

2  the incident, so she was --

3     Q.   Now, you've named Chief Warren
4  individually or personally.  What do you
5  think that he did wrong?

6     A.   It all starts way before my
7  incident, and due to the situation that
8  Chief Warren was in the back of the Sleepy
9  Hollow High School in his car with his
10 girlfriend, okay.

11    Q.   What's his girlfriend's name?

12    A.   I don't know because he's
13 married, and his wife is a sergeant in the
14 County Corrections.  And this is one of the
15 most simple I think that is definitely that
16 is related to Detective Quinoy.  And the
17 custodian heard her yelling and screaming.
18 She was kicking the car, crashing Jimmy.

19    Q.   The custodian you said?

20    A.   The custodian of the high
21 school.  He called the police.  I mean
22 Police Officer Quinoy responded to the
23 incident.  After that, everything was taken
24 care of, and nothing was done about it.
25 Everything was quiet.  A little bit after

155

M. GOMEZ

2  that, Police Officer Quinoy was promoted to
3  Detective Quinoy.

4     Q.   When was this?

5     A.   Oh, that's a few years back.

6     Q.   Can you approximate for me how
7  many years?

8     A.   Say, three years, three or four
9  years, three years ago.

10    Q.   2005?

11    A.   So, 2005, 2004, around there.

12    Q.   What was the custodian's name?

13    A.   I have no idea.

14    Q.   Did you personally speak with
15 the custodian?

16    A.   No.  I was given this
17 information by friends.

18    Q.   Who gave you this information?

19    A.   I heard that from around town
20 actually, you know.

21    Q.   Well, who specifically told
22 you; what was the person or persons' names?

23    A.   You know, the whole town knows
24 what's going on, so, basically.

25    Q.   I'm not asking you what anyone

156

M. GOMEZ

2  else knows.  I'm asking you who told you
3  this information?

4          MR. YOUNG:  Or any of the
5          individuals.

6     Q.   Or any of the individuals.

7     A.   Right, that gave me the
8  information.  I can't remember now.  I'm
9  sorry.

10    Q.   Were any of the individuals
11 that told you this information members of
12 the police department, of the Sleepy Hollow
13 Police Department?

14          MS. SHERVEN:  Let the record
15          reflect the Witness, that the
16          Plaintiff is looking at his Counsel
17          for direction, and Counsel is nodding
18          his head.  He's not saying anything,
19          but he's nodding his head.

20    A.   Yes.

21    Q.   Which members of the Sleepy
22 Hollow Police Department told you this?

23    A.   Honestly, Counsel, it was quite
24 a few years back, and I have all the things
25 to tell you about Jimmy Warren.  I think

157

1          M. GOMEZ
2  we're spending a little time on this.  I
3  can't remember exactly what member told me.
4          MR. YOUNG:  Excuse me I know a
5      question is pending.  Come outside.
6          (Whereupon, a discussion was
7      held off the record outside of the
8      room.)
9          MS. SHERVEN:  Note my objection
10     for the record that the Witness and
11     his attorney left the room while a
12     question was pending.
13     Q.   Now, that you've had time to
14  consult with your attorney, would you like
15  to change your testimony in any way
16  concerning the previous question?
17         MR. YOUNG:  Or add to your
18     testimony.
19     A.   Yes.
20     Q.   What would you like to add or
21  change?
22     A.   Well, I remember now that where
23  I get my information.
24     Q.   Okay.  Where did you get your
25  information?

158

1          M. GOMEZ
2      A.   Well, my friend told me about
3  it.
4      Q.   Which friend?
5      A.   Joe.
6      Q.   What's Joe's last name?
7      A.   Cotarelo C-O-T-A-R-E-L-O.
8      Q.   Is Mr. Cotarelo employed by the
9  Sleepy Hollow Police Department?
10     A.   Yes.
11     Q.   Is he presently employed as far
12  as you know?
13     A.   Yes.
14     Q.   And he was as of the time you
15  learned this information?
16     A.   Yes.
17     Q.   How do you know Mr. Cotarelo?
18     A.   Well, we grew up together.
19     Q.   What did Mr. Cotarelo or
20  Officer Cotarelo tell you about this
21  incident involving Chief Warren?
22     A.   He just told me a story about
23  as to what happened.
24     Q.   That would be essentially what
25  you had told us earlier?

159

1          M. GOMEZ
2      A.   The incident in the parking
3  lot?
4      Q.   The incident in the parking
5  lot.
6      A.   Yes.
7      Q.   Do you believe that there is
8  some connection between this incident and
9  from what you said earlier Detective Quinoy
10  being promoted?
11     A.   Yes, definitely.  And it's
12  quite a few more incidents.
13     Q.   We're just talking about this
14  one right now.  I'll followup with other
15  incidents.
16     A.   Okay.
17     Q.   Why do you believe that this
18  incident has any connection to Detective
19  Quinoy being promoted?
20     A.   Well, I believe in my opinion,
21  and I don't know what type of one hand
22  washes the other is --
23     Q.   Regarding a promotion, are you
24  referring from police officer to detective
25  or something else?

160

1          M. GOMEZ
2      A.   Yes, from police officer to
3  detective.  And quite a few more other
4  things that happened then.
5      Q.   What are these other things
6  that happened?  Again, we're talking
7  specifically --
8      A.   About Jimmy Warren.
9      Q.   -- so, we don't go too far off
10  left field here, as you to what you believe
11  Chief Warren did wrong as to why he's
12  personally named in this lawsuit, okay.
13     A.   Okay.
14     Q.   What other incidents are you
15  referring to?
16     A.   I'm referring to the incident
17  of the -- there was a lady in Sleepy Hollow
18  that went wrote a statement and gave it to
19  Chief Warren and the detective, and Chief
20  Warren was aware about Quinoy, Detective
21  Quinoy sexually harassing her, and he never
22  did anything about it, okay.
23          After the lady made the threat
24  that she was going to come to the County, I
25  guess he talked to Quinoy and Quinoy

161

M. GOMEZ

2 stopped.

3    Q.   Are you finished with that

incident?  Were you just going to move onto

something else.

6    A.   No.  I'm finished with that

7 incident.

8    Q.   I'm going to stop after each

9 incident, okay.  That way I can make sure

10 that we have all the information that we

11 need.  Who is this woman that you're

12 referring to?

13    A.   Her name was -- well, she

14 passed away, you know.  She was very fairly

15 young, and about a year ago, a year and a

16 half ago.  This incident happened two, three

17 years ago.

18    Q.   This incident that you're

19 talking about involving a woman in Sleepy

20 Hollow happened two or three years ago?

21    A.   Yes, three or four years ago I

22 would say, you know.

23    Q.   What was that woman's name?

24    A.   Anna I believe it's Barreo

25 B-A-R-R-E-O, something like -- I'm pretty

162

M. GOMEZ

2 sure it's that way.  There has been quite a

3 few other arrests and excessive use of

4 force.

5         MR. YOUNG:  We'll get to it.

6    One at a time.

7    Q.   How did you learn this

8 information involving this woman Ms. Barreo?

9    A.   Oh, that was from one of the

10 guys.  She was from the Dominican Republic.

11 And one of the guys then was my friend, and

12 when I go by Beekman Avenue, there's a lot

13 of people live there from the Dominican

14 Republic, I came to know that information.

15    Q.   So, you learned this from a

16 friend?

17    A.   Yes.

18    Q.   Who's from the Dominican

19 Republic, the same as Miss Barreo?

20    A.   Yes.

21    Q.   How does this incident that

22 you're describing with Detective Quinoy and

23 Miss Barreo relate to your case?

24    A.   It relates that when Detective

25 Quinoy.  There was also --

163

M. GOMEZ

2         MR. YOUNG:  Forget all the

3    other stuff.  How do you think --

4    this is not really a question for

5    you.  It's a question for me.  But

6    since she's asking you it, I'll let

7    you answer it.  How do you think

8    that's relevant to your claim?

9    A.   I think all these things that

10 have been going on Chief Warren covering it

11 for Detective Quinoy has allowed Detective

12 Quinoy to do his job with impunity, and do

13 whatever he wants around the Village with

14 nothing, no question being asked.  And

15 that's the reason that I think Jimmy Warren

16 is very responsible for everything that has

17 been going.  Not only with my incident, with

18 a lot of other incidents in the Village of

19 Sleepy Hollow.

20    Q.   What other incidents are you

21 referring to?

22    A.   There was a case when different

23 arrests.  He falsely arrest a guy.  The guy

24 got -- beat the case.  Got cut loose.  And a

25 couple of months down the line, he waited.

164

M. GOMEZ

2 The guy got into some problems with two of

3 the guys from Greenburgh.  He let the other

4 two guys from Greenburgh go, and he arrested

5 him to get back at him.

6    Q.   Let me stop you there.  Who is

7 the he that you're referring to?

8    A.   I left my --

9         MR. YOUNG:  We can leave a

10    blank in the transcript.

11    A.   Yeah.

12    Q.   You mean.  I'm confused because

13 you were saying "he".  Were you referring to

14 --

15    A.   -- the guy who was falsely

16 arrested.

17    Q.   Do you know the individual's

18 name who you're saying was falsely arrested?

19    A.   Yes.  I just didn't bring it

20 with me.  I just didn't know that this was

21 going to come out.

22    Q.   We'll leave a blank in the

23 transcript then for you to fill in that

24 information?

25    A.   _____

165

M. GOMEZ

1
2    Q.   Who was the police officer that
3 you believe falsely arrested this man?
4    A.   Oh, Detective Quinoy.
5    Q.   How did you learn this
6 information?
7    A.   Also from people after this
8 incident happened, a lot of people had come
9 forward in the Village.  Nothing to do with
10 the Sleepy Hollow Police Department, and
11 they had given me the information that I
12 know here's what happened.  Here's what I
13 know, and they are willing to come forward
14 and give this side of the story, also.
15    Q.   When did you learn this
16 information?
17    A.   Well, about six, seven months
18 ago, eight months ago.  It's been a while
19 ago.
20    Q.   It was sometime after you were
21 arrested?
22    A.   Yes.  Everything is mainly
23 after.
24    Q.   Who are these individuals that
25 you're saying are willing to come forward?

166

M. GOMEZ

1
2    A.   Well, their people that I'm
3 going to give you names, right.
4    Q.   Yes.  The individuals, what are
5 their names?
6    A.   There was another case --
7    Q.   No.  I'm asking you
8 specifically what were these individuals
9 that you had said are willing to come
10 forward, what are their names?
11        MR. YOUNG:  Are these the
12    victims talking about that are
13    willing to come forward?
14    Q.   I believe my understanding was
15 that you just said that these individuals
16 who were willing to come forward, that these
17 were people that were aware of these false
18 arrests incidents that you were just telling
19 us about, right?
20    A.   Yes.
21    Q.   But you don't know any of those
22 individuals who you say are willing to come
23 forward?  You don't know their names?
24    A.   Oh, the guy, he came forward
25 and told me that.  I'm not really a personal

167

M. GOMEZ

1
2 friend of his, you know.  And the other guy
3 who got arrested and Quinoy broke his wrist.
4    Q.   I'm going to stop you there.
5 We're going to come back to that.  But we're
6 talking about just this incident or this
7 thing that you've been telling us about
8 involving a man, whose name you don't
9 remember and Detective Quinoy.
10       Are there individuals who saw
11 something that and that are willing to come
12 forward about that man?
13    A.   Wait a minute.
14    Q.   You said earlier that there
15 were individuals who were willing to come
16 forward.  Are you talking about people who
17 have had their own involvement with
18 Detective Quinoy?
19    A.   Yes.
20    Q.   Or let me finish my question,
21 or you talking about individuals who
22 witnessed something specific concerning this
23 arrest that you've just told us about?
24    A.   Both.  People had prior
25 incidents with Detective Quinoy.

168

M. GOMEZ

1
2    Q.   We're going to come back to
3 that.  Who are those people that you say
4 were witnesses to this specific incident
5 involving the man whose name you don't
6 remember, who you said was falsely arrested
7 and Detective Quinoy.
8    A.   Debra Lynn was one.
9    Q.   I'm sorry?
10    A.   Debra Lynn.
11    Q.   Do you know how to spell her
12 name?
13    A.   Debra D-E-B-R-A.  Lynn is
14 L-Y-N-N.
15    Q.   Where does she live?
16    A.   She was she had a dance studio
17 across the street.  She's the one that made
18 the statement.
19    Q.   Does she live or work in Sleepy
20 Hollow?
21    A.   Yes.  Yes.
22    Q.   Do you know the address?
23    A.   Actually, she moved because it
24 was a fire in the building.  It's been over
25 a year, you know.

169

M. GOMEZ

2  MR. YOUNG: Let me interject
3  here. You're not following it
   because this Debra Lynn was a witness
   to Mario's assault, not this other
6  fellow you're thinking about.
7  MS. SHERVEN: For the record
8  obviously, Counsel's interjecting
9  because he has knowledge to this.
10  Q. I'm just going to ask Mr.
11 Gomez, please, I'm just asking you right now
12 witnesses to this other incident that you
13 described to us.
14  MR. YOUNG: The Greenburgh
15  false arrest deal.
16  Q. Just that. Nothing else.
17  A. To the other guy the false
18 arrest. No. No. The guy who wanted to be
19 witnesses was him. He wanted to come
20 forward and be as a witness. That he also
21 had a problem with Detective Quinoy, and he
22 was willing to give his side of the story.
23  Q. Did anyone else tell you that
24 they were a witness to his involvement and
25 if they were willing to come forward about

170

M. GOMEZ

2  that?
3  A. Oh, no, no, no. I
4  misunderstood completely. I thought you
5  were saying the whole thing.
6  MR. YOUNG: Well, that's the
7  way the question was asked, but,
8  okay.
9  Q. Because you brought up Debra
10 Lynn, and this didn't have anything to do
11 with this other gentleman and Detective
12 Quinoy, what exactly is Deborah Lynn a
13 witness to?
14  A. Debra Lynn is a witness to that
15 she actually made a statement to Lieutenant
16 Barry Campbell when he was doing his
17 investigation, that she saw Detective Quinoy
18 kick me in the face while I was sitting down
19 cuffed behind my back inside the patrol car.
20  Q. How did you learn that she was
   a witness?
22  A. My criminal court attorney told
23 me, and I don't know.
24  Q. Was that Angel Perez or someone
25 else?

171

M. GOMEZ

2  A. I think it was Angel Perez. I
3  know that for a very long time. You know,
4  Counsel --
5  MR. YOUNG: -- hold on. Hold
6  on. Just stick to the question. How
7  did you know that, and you gave your
8  answer.
9  Q. Have you spoken with Miss Lynn
10 about what she allegedly witnessed?
11  A. No.
12  Q. Had anyone else come forward
13 either to you personally, a family member,
14 or any of your attorneys to say that they
15 were a witness to the events surrounding
16 your arrest?
17  MR. YOUNG: He may not know
18  what I'm privy to. Go ahead.
19  MS. SHERVEN: Obviously, this
20  is all based on his knowledge.
21  A. There was a lady that lives
22 right across the street, and her name is
23 Rosa Negron, and her daughter also saw the
24 incident. I can't remember her name. And I
25 remembered after I came out of the jail, I

172

M. GOMEZ

2  was walking around with my wife going to a
3  doctor's appointment and we saw her. And
4  she said anything that you need, I saw
5  everything that happened.
6  And come to find out that about
7  three months down the line, my wife saw her
8  again, and she said, are you ready because
9  it's getting ready? She said, no, I'm
10 sorry. I'm not allowed to. I can't talk to
11 you anymore.
12  And is from what I heard her
13 uncle or one of her daughter had a problem
14 with Detective Quinoy. And after they find
15 out that she came forward, and she wanted to
16 testify on my behalf. Somebody in the
17 Sleepy Hollow Police Department must have
18 said something to her and scare her, and now
19 she's completely they don't want anything to
20 do with it either. She already spoke to my
21 attorney Angel Perez.
22  MS. SHERVEN: I move to strike
23  the portion that's nonresponsive to
24  the question.
25  Q. Did Miss Negron ever tell you

173

M. GOMEZ

2 that someone has spoken to her or influenced
3 her decision not to give information?
4      A.   She told me actually that one
5 time that I spoke to her that she didn't
6 want to get involved, but I think she told
7 my attorney, yes, that she had spoken to
8 Detective Quinoy.
9      Q.   Which attorney did she tell
10 that to, a criminal attorney or someone
11 else?
12      A.   No, the criminal attorney, yes.
13      Q.   With Mr. Perez or the attorney
14 before him?
15      A.   I think it was Mr. Perez,
16 because I already knew that for a very long
17 time that she started changing her mind.
18      Q.   Anyone else tell you or any
19 member of your family or your attorney so
20 that you learned that someone else said that
21 they were a witness to the events
22 surrounding your arrest?
23      A.   To the events.  Well, my
24 daughter had made a statement that during
25 the time that I was in the cell, and my wife

174

M. GOMEZ

2 was getting arrested, she was communicating
3 on the cell phone with Detective Quinoy.
4      Q.   I'm going to stop you there,
5 because I'm asking you about any witnesses
6 to the events 'cause your daughter wasn't
7 there during that time, correct.
8           MR. YOUNG:  No, but you may
9      just want to listen to what he just
10      said.
11           MS. SHERVEN:  I want to get
12      responsive answers to my questions.
13      Q.   You're referring to when you
14 said your daughter, you're referring to
15 Haydee?
16      A.   Yes.
17      Q.   Was Haydee present at all
18 during the events surrounding your arrest?
19      A.   No.  She came back to it.
20      Q.   We'll come back to Haydee, but
21 has anyone else told you or do you now know
22 that anyone else was a witness to the events
23 surrounding your arrest?
24           MR. YOUNG:  Mind you, are you
25      talking about an eye witness?

175

M. GOMEZ

2           MS. SHERVEN:  An eyewitness or
3      anyone who may have seen or heard --
4      A.   Yes, I got.
5      Q.   -- to the incident?
6           MR. YOUNG:  The assault not
7      what happened.
8      A.   I went to the incident.
9      Q.   I'm going to stop you.  Because
10 I'm going to ask the question, because
11 Counsel has injected into my question.
12           Has anyone told you that they
13 either saw or heard the events surrounding
14 your arrest on October 17, 2006, other than
15 the two people, possibly three if you
16 include the women's daughter, other than
17 those three people, has anyone else told
18 you?
19      A.   Yes.
20      Q.   Who else?
21      A.   James Hayes.
22      Q.   I'm sorry, what's the person's
23 name?
24      A.   James, Jimmy Hayes and Danny
25 Hayes, Daniel Hayes.

176

M. GOMEZ

2      Q.   Are they related in some way to
3 Officer Hayes and Lieutenant Hayes?
4      A.   Yes, brothers.  Brothers to
5 Michael Hayes.  I mean Mike Hayes.
6      Q.   And their father is also
7 Lieutenant Gabriel Hayes?
8      A.   Yes.
9      Q.   Are they police officers?
10      A.   No.  One is the Ambulance Chief
11 and the other one is Assistant Fire Chief.
12 And what happened is the police station is
13 here.
14      Q.   Okay, I'm going to stop you
15 there, because I haven't asked you anything
16 than what their jobs are essentially.
17      A.   Okay.
18      Q.   What did James Hayes tell you
19 that he either witnessed or?
20      A.   Well, he didn't see it from the
21 start.  He didn't witness it from the
22 beginning for who threw the first blow or
23 anything.  He didn't see that.  But he saw
24 when I was on the ground, when I was getting
25 kicked in the head, and when I was tased.

177

M. GOMEZ

1   Q.   Did he tell you that
3   personally, or did someone else relay that
    information to you?
        A.   No.  He told me that
6   personally.  He told also my criminal court
7   attorney.
        MR. YOUNG:   You've answered the
9       question.
10      Q.   Did James Hayes say anything
11  else to you or to your attorney about the
12  events other than what you've just told us?
13      A.   What do you mean about other
14  events?
15      Q.   Did he say anything else about
16  this, about what he may have seen or heard?
17      A.   No.  He just say that he saw, at
18  least, three-quarters.
19      Q.   What about Danny Hayes?  What
20  did he tell you he saw or heard?
21      A.   Basically the same thing as his
22  brother.
23      Q.   Were they together; if you
24  know?
25      A.   That's what I was trying to

178

M. GOMEZ

2   explain to you before.  The police station
3   is here, and right next to it is the fire
4   station, and right next to it is the
5   ambulance corps right in the same street.
6   So, there were all within walking distance.
7       Q.   Other than the individuals
8   you've just told us about, anyone else come
9   forward and told you or anyone on your
10  behalf that they were witnesses to the
11  actual events?
12      A.   No, not that I can remember,
13  no.
14      Q.   So, the only witnesses that
15  you're aware of are Debra Lynn, Rosa Negron,
16  possibly her daughter?
17      A.   And her daughter was also
18  there.  She definitely saw it.
19      Q.   But you don't recall her
20  daughter's name, right?
        A.   No, I can't remember right now.
22      MS. SHERVEN:   If we leave a
23      blank in the transcript, can you fill
24      in the name of Rosa Negron's
25      daughter.

179

M. GOMEZ

2       A.   Yes, I have it written down.

4       MR. YOUNG:   By the way, these
5   are in our recent discovery.
6       Q.   You just mentioned that you
7   have it written down, do you have diary or
8   something that you maintain?
9       A.   No.  No.
10      Q.   Where do you have this written?
11      A.   Where I live at.
12      Q.   In a notebook?
13      A.   No, basically in papers.  I
14  started writing notes and I keep it, and I
15  got a folder.
16      MS. SHERVEN:   I'm going to call
17      for production of any handwritten
18      notes.  I believe they're encompassed
19      in our demand, our interrogatories
20      and demand for documents.
21      MR. YOUNG:   I'm going to ask
22      you to be specific here, because I
23      don't think you're entitled to any
24      private notes.
25      MS. SHERVEN:   From what he said

180

M. GOMEZ

2       so far, this does not raise any
3       privilege, so I believe the demand
4       speaks for itself.  I believe we are
5       entitled to it.
6       A.   Well, Counsel --
7       MR. YOUNG:   -- no.  No.  No.
8       No.  Stop.
9       Q.   Any other witnesses other than
10  who we've already talked about to these
11  events, Debra Lynn, Rosa Negron, and her
12  daughter, James Hayes or Danny Hayes, anyone
13  else tell you or anyone on your behalf that
14  they were a witness?
15      A.   No, no, not that I can recall.
16      Q.   Now, you testified earlier that
17  Haydee came to the police station at some
18  point in time; is that right?
19      A.   Yes.
20      Q.   Did you speak with her?
21      A.   At that time?
22      Q.   At that time.
23      A.   No.
24      Q.   Did your wife speak to her; if
25  you know?

181

M. GOMEZ

1  M. GOMEZ
2     A.    Yes.
3     Q.    Do you know what they spoke
   about?
4     A.    I have no idea.
6     Q.    At some point in time did you
7  learn that Haydee had conversations with
8  Detective Quinoy while she was at the police
9  station?
10    A.    Yes.
11    Q.    What was that?
12    A.    When -- because after the
13 arrest, my wife didn't get arrested at the
14 same time, and she went -- was arrested and
15 took me to the hospital.  And she at that
16 time she called my daughter and her cousin
17 had took her to the hospital to get
18 treatment.
19    Q.    Okay.  Right now I'm just
20 asking though about that conversation that
21 Haydee may have reported either to yourself
22 or to your wife, the conversation she had
23 with Detective Quinoy?
24    A.    She had the conversation when
25 they brought my wife to the hospital, from

182

M. GOMEZ

1  M. GOMEZ
2  the hospital to the police station to ask
3  about how can she get my car released.
4        At that point, Detective Quinoy
5  came out and arrest my wife.  And during
6  that time of the conversation, he was trying
7  to communicate with my daughter on the cell
8  phone.  And my wife told him no, the battery
9  is died, so you're not going to be able to
10 talk to her.  So, they were actually
11 communicating, because my daughter told me
12 that Detective Quinoy during the time that
13 -- in the beginning of the incident when I
14 was coming down that I was getting dressed
15 and I was coming driving down, Detective
16 Quinoy had called my daughter and told her,
17 listen, I just had an argument with your
18 dad, okay.  He's coming down, and somebody's
19 got to teach him a lesson.  That was his
20 exact words to my daughter.
21    Q.    How do you know that?
22    A.    Because my daughter told me.
23 So, my daughter had already knew that I was
24 on my way down to the police station and
25 there was going to be no problems, you know.

183

M. GOMEZ

1  M. GOMEZ
2  And I was going to be talking to him in a
3  descent manner, never expecting that was
4  going to happen.
5        So, that mean, in my opinion
6  that he had it premeditated that somebody
7  has to teach him a lesson that sounds like
8  aggressive words to me and fighting words.
9        MS. SHERVEN:  Move to strike
10       the portions that were not
11       responsive.
12    Q.    Right now we're only talking
13 about the conversation that Haydee and
14 Detective Quinoy may have had at the police
15 station, whether it was on the phone or in
16 person.
17        What was the sum and substance
18 of that conversation from what you've since
19 then learned?
20    A.    The only conversation that I
21 know or I can't remember now -- she talked
22 to Detective Quinoy on the phone after that
23 whole incident happened, he said, listen, I
24 had to -- what happens I had pushed -- he
25 didn't tell her -- I think I push a little

184

M. GOMEZ

1  M. GOMEZ
2  bit your mom against the car.  And she said,
3  where is she?  She's in the hospital.  I
4  mean she's going to go, but I don't know
5  what's going to happen after that.  This was
6  before my wife went.
7        There was a point that he said
8  you arresting my mom, and he said, yeah, I
9  have to arrest --
10    Q.    -- when you're saying "he", do
11 you mean Haydee?
12    A.    No, he, Detective Quinoy.
13    Q.    He said you're going to arrest
14 my mom?
15    A.    No.  My daughter say it in a
16 conversation.  I can't remember the exact
17 words, because she told me the story.  I
18 don't and I lost it.  She said, you
19 arresting my mom?  He say, yeah, I have to
20 arrest your mom.  And then my daughter said,
21 now, you're really fucked up.  She told that
22 to Detective Quinoy.
23        That's pretty much.  I'm just
24 telling with different things, you know, a
25 lot of parts that I have been forgetting

185

M. GOMEZ

2 because the medication that I got me, I'm
3 forgetting a lot of things, Counsel, you
4 know.
5      Q.   Which medication?
6      A.   The Topamax.
7      Q.   You're telling me now, though,
8 that this medication the Topamax is
9 affecting your testimony?
10     A.   No, not at all. I'm straight
11 as an arrow. What I'm saying is sometimes
12 it takes me a little time to put two and two
13 together, to make it four. You know, I got
14 to go around in circles a little bit.
15          MR. YOUNG:  Off the record.
16          (Whereupon, a discussion was
17 held off the record.)
18     A.   Counsel, I had another incident
19 that where because remember Detective Quinoy
20 was my neighbor, and I had another incident
21 relating to Jimmy Warren and Detective
22 Quinoy relating, the connection.
23          MR. YOUNG:  There's a few more.
24     She's going to get to that.
25     Q.   Was there anything else about

186

M. GOMEZ

2 Haydee with her being a witness at all in
3 this case, other than what you've just told
4 us about?
5      A.   Well, the only thing that I can
6 you is that during the time of the arrest,
7 that was I was already in the cells and my
8 wife was being processed, they were
9 communicating with each other on the cell
10 phone back and forth.
11     Q.   How do you know that they were
12 on the phone? Is this something she told
13 you, or did you learn that from someone
14 else.
15     A.   Yes.
16     Q.   She told you?
17     A.   Yes. She told me, and my wife
18 saw her and finally her battery died down.
19     Q.   Let's go back to the incidents
20 that you began to describe as to why you are
21 suing Chief Warren?
22     A.   Yes.
23     Q.   You had just started to talk
24 about another incident?
25     A.   Yes.

187

M. GOMEZ

2      Q.   What was that?
3      A.   There was an incident with
4 Detective Quinoy's wife with the first one
5 she had a fight with another lady on the
6 street on St. Patrick's Day parade. The
7 lady was cut and she was jumped by Quinoy's
8 wife and some of her friends and everything.
9 And Chief Warren talked to the lady, and she
10 retrieved the charges and nothing was done.
11     Q.   Let me stop you there. Do you
12 know when this incident was?
13     A.   About three years ago, three
14 years to four years because -- that's all.
15     Q.   Do you know what the other
16 woman's name is?
17     A.   Quinoy's wife?
18     Q.   No. The other woman?
19          MR. YOUNG:  Who was jumped.
20     A.   Oh, she used to be a dance
21 teacher in YMCA. I forgot her name.
22          MR. YOUNG:  Leave a blank.
23     Q.   Do you know her name?
24     A.   No. No.
25     Q.   Is there anything, if we left a

188

M. GOMEZ

2 blank in the transcript, would you be able
3 to fill it in?
4      A.   I'll try to get it. I don't
5 know if I have it. I know she was a
6 teacher, a dance teacher in the YMCA for
7 quite a while. I don't know if she's still
8 there. I don't know.
9 _____
10     Q.   Just so I'm understanding you,
11 is it your belief that this woman pressed
12 charges on a police report against Detective
13 Quinoy's wife?
14     A.   Yes.
15     Q.   Do you know what happened to
16 that police report?
17     A.   No, but I guess Chief Warren
18 talked to the lady, and she dropped
19 everything, and everything was squashed.
20     Q.   Was Detective Quinoy's wife
21 arrested?
22     A.   No.
23     Q.   As far as you know, there had
24 been a Complaint?
25     A.   Yes.

189

M. GOMEZ

2     Q.  But she had not been arrested?

3     A.  Right.

    Q.  What leads you to believe that
Chief Warren spoke to this other woman?

6     A.  I don't have anything to

7 confirm on that, but it couldn't have be

8 anybody else except him, because you know

9 I'm trying to put two and two together here.

10 You know, with everything that's related to

11 Detective Quinoy.

12     Q.  This is your suspicion?

13     A.  Yes.

14     Q.  No one specifically told you

15 that Chief Warren influenced this woman to

16 drop the charges?

17     A.  No.

18     Q.  Now, you started to go onto

19 another incident?

20     A.  Yes.

21     Q.  What is that?

22     A.  That was during the time that

23 he was my neighbor. He moved out from where

24 I lived at about four years ago, no, three

25 years ago. And his wife was going to

190

M. GOMEZ

2 Westchester Community College, and she was

3 talking to somebody else or something must

4 have happened. Detective Quinoy got upset

5 about it. Got mad, and they had a lot of

6 family disputes and a lot of family -- what

7 do you call when the police come to the

8 house?

9     MR. YOUNG: Domestic issues.

10     A.  Domestic issues, yes.

11     MS. SHERVEN: I'm going to

12 object, though, to Counsel giving the

13 witness any --

14     A.  Domestic violence.

15     MS. SHERVEN: -- any added

16 testimony, just based on your

17 recollection.

18     A.  No, I'm trying to come out with

19 the right words, Counsel, because I don't

20 want to throw any, you know, no good words

: in the testimony.

22     He had a lot of domestic issues

23 and a lot of domestic violence during the

24 time that he was my neighbor, because I know

25 that for a fact.

191

M. GOMEZ

2     Now, the incident I'm trying to

3 get to. His wife was going to Westchester

4 Community College. He got upset. He got

5 jealous, and put the gun on his wife's head.

6 His wife went to the Police Chief herself,

7 and made out a complaint okay. And this was

8 investigated by the County Police.

9     Q.  How did you learn this

10 information?

11     A.  From people on the streets. I

12 mean you got a lot of people that talking,

13 you know, people on the streets.

14     Q.  Who did Detective Quinoy's wife

15 supposedly report this incident to?

16     A.  To Chief Warren.

17     Q.  Chief Warren?

18     A.  Yes.

19     Q.  Okay. When was this

20 approximately?

21     A.  Oh, at about everything is

22 around three years, four years, two years,

23 three years ago, three, three years ago,

24 three or four years ago.

25     Q.  Now, you said that the County

192

M. GOMEZ

2 investigated?

3     A.  Yes.

4     Q.  Do you know what the results

5 were?

6     A.  I have no idea. It was swept

7 under the table, under the rug also by Chief

8 Warren.

9     Q.  What leads you to believe that

10 the Chief swept something under the rug in

11 the way that you just testified?

12     A.  Counselor, I don't think that

13 just because he's a detective or a police

14 officer that he had the right because he's

15 in a jealous rage to put a gun on your

16 wife's head.

17     I think that's something that

18 he could have been reprimanded or he could

19 get suspended from being off duty or.

20     Q.  Do you have any evidence that

21 the Chief swept this under the rug?

22     A.  I don't have any evidence

23 factual evidence, written papers.

24     Q.  Or someone who told you that,

25 any evidence?

193

M. GOMEZ

1   A.   The evidence is that you can
2   check that yourself, because the County
3   Police investigated, there has to be an
4   entry on the County.  And when they come up
5   and the County Police came to the Sleepy
6   Hollow Police Department.
7   Q.   I'm going to stop you, because
8   you're not answering my question.  Do you
9   have any evidence, though, that the Chief
10  was somehow involved in some coverup in this
11  incident, or is this just your suspension?
12  A.   Well, I don't have any actual
13  factual evidence, but I know that the only
14  one that can make that determination to
15  letting an officer continue working in the
16  department after he makes such, you know,
17  such a daily, you know, the putting the gun
18  on the wife's head and threatening to kill
19  her if see continues talking to that other
20  guy, that's against the law.
21       MR. YOUNG:  All right.  All
22       right.  Look, they can draw their own
23       conclusions.  You've drawn those.
24       Next question.

194

M. GOMEZ

1   Q.   Are there any other incidents
2   that you believe shows why Chief Warren is
3   named in this lawsuit, or that he did
4   something wrong?
5   A.   There's another incident that
6   he failed to supervise, I got the cuttings
7   -- well, it just came out in the Journal
8   News.  There was a police officer in Sleepy
9   Hollow who was little bit of a loose cannon,
10  and he got in problems.  He got a transfer.
11  He put a transfer to Mount Vernon.
12       During the time that he was in
13  Sleepy Hollow, he got in a family domestic
14  violence with his wife.  The Family Court
15  Judge issued an order to take his gun away
16  until everything was resolved.
17       Chief Brown determined --
18  Q.   I'm sorry.  You're saying Chief
19  Brown.
20  A.   I mean not Chief Brown.
21  Q.   Because Chief Brown is the
22  Chief of Tarrytown, right?
23  A.   I'm sorry.
24       MR. YOUNG:  That's correct.

195

M. GOMEZ

1   Q.   So, you're not referring to
2   Chief Brown?
3   A.   No, no, of course, not.
4   Q.   Who are you referring to?
5   A.   Chief Warren.  Jimmy Warren,
6   yes.
7   Q.   I didn't mean to interrupt you.
8   I wanted to make sure the record is clear
9   about who you're talking about.
10  A.   Chief Jimmy Warren or James
11  Warren, he's the officer in my town, and
12  he's my friend, so I'm going to continue to
13  allow him to carry that personal firearm.
14       That officer went to one of the
15  restaurants in Hawthorne, or I forgot the
16  name of the town.  I know it's a little bit
17  upstate.  Got into a dispute with the
18  manager of the restaurant and pulled a gun
19  out on the manager.
20       The officer just got arrested
21  for breaking somebody's jaw in Sleepy
22  Hollow, because he lives in Sleepy Hollow,
23  because after he cuffed the guy, he
24  continued beating the guy down, because the

196

M. GOMEZ

1   guy disrespected his daughter.
2   Q.   Are you talking about the same
3   police officer during these incidents?
4   A.   Yeah.  The same police officer
5   that pulled the gun on the restaurant owner,
6   he had got arrested recently because cuffed
7   the other guy and knock him to the ground,
8   and then broke his jaw, because the guy was
9   saying some bad words to his daughter and
10  disrespecting his daughter.
11       Because even though he works
12  for Mount Vernon, he still lives in Sleepy
13  Hollow.  He's a personal friend of Chief
14  Warren.
15  Q.   Do you know this police
16  officer's name?
17  A.   I don't have -- I can't
18  remember now.  I got that article, and I got
19  his name.
20       MS. SHERVEN:  Okay.  I'm going
21       to ask that we leave a blank, and
22       we'll call for his name, and we'll
23       call for the production of these
24       newspapers articles that you're

197

M. GOMEZ

1
2     referring to.
3     A.     _____.
      Q.     When was this, by the way?
      A.     At the restaurant that officer
6  had was issued an order by the Family Court
7  Order to take his gun away.
8     Q.     When was that?
9     A.     I have no idea, but that was
10 prior.  That's when he was a police officer
11 in Sleepy Hollow.
12    Q.     Now, did you learn this
13 information from the newspaper article or
14 some other source?
15    A.     From some other source I think,
16 but it was also in the newspaper article.
17    Q.     Who was this other source where
18 you learned --
19    A.     -- friends, friends, I don't
20 remember the name.  Except no police officer
21 You meet so many people on the streets that
22 I --
23    Q.     Are there any other incidents
24 that for which you believe that Chief Warren
25 did something wrong and is being sued in

198

M. GOMEZ

2  this case?
3            MR. YOUNG:  May I remind him?
4     I mean you can find out now or later.
5            MS. SHERVEN:  No, obviously,
6     we'll have interrogatories.  This is
7     based on his.
8     A.     It's a lot of things that I
9  forget, Counselor, and he knows.
10           MR. YOUNG:  You don't want to
11    know about them, that's fine.  I'm
12    giving you an offer right now that
13    obviously the medical records
14    indicate that Mario as a result of
15    this, has some memory issues.  I am
16    aware of other incidents.  If you
17    don't want me to tell them to you, I
18    won't.
19           MS. SHERVEN:  Counselor, are
20    these incidents that Mario has told
21    you about that you believe that he
22    has forgotten?
23           MR. YOUNG:  Apparently, yes.
24           MS. SHERVEN:  How many other
25    incidents are you relating to.

199

M. GOMEZ

1
2            MR. YOUNG:  Well, I can tell
3     you there are at least two other
4     ones, and each one I can mention one
5     word, and it will probably refresh
6     his recollection.
7            MS. SHERVEN:  I mean I want to
8     keep this clear, because this is not
9     typically how depositions are
10    conducted.
11           MR. YOUNG:  I understand.
12           MS. SHERVEN:  However, I do
13    want to know all of the reasons, Mr.
14    Gomez, for why you are suing Chief
15    Warren individually, because we're
16    not talking just about the Police
17    Department, here.  We're talking
18    about these people as individuals.
19           MR. YOUNG:  There are three
20    other individuals.
21           MS. SHERVEN:  So, if your
22    Counsel can say in very brief terms.
23           MR. YOUNG:  One word on each
24    one.  No. 1, barber shop.
25    A.     Oh, yes.  There was another

200

M. GOMEZ

2  incident in the barber shop that Detective
3  Quinoy went in with a couple of police
4  officers.  And he arrested and he destroyed
5  the barber shop because he was cutting hair
6  without a license.
7     Q.     Is the proprietor of the store
8  or the barber shop?
9     A.     Right.  And he destroyed
10 everything, the mirror's was pushed.  The
11 guy dislocated his shoulder.  The guy didn't
12 want to pursue the charges.  He talked to
13 Jimmy Warren.
14    Q.     Let me stop you there.  Who are
15 you referring to this time that destroyed
16 the mirrors?
17    A.     Detective Quinoy.
18    Q.     You can continue.
19    A.     And he dislocated his shoulder
20 and everything.  Also, when he fill out the
21 arrest report, he didn't put his name down.
22 He got the other police officer to put down
23 that he had done everything and everything,
24 you know.  That was -- you know, Jimmy
25 Warren was aware of that.

201

M. GOMEZ

1  Q.   When did this happen?
2  A.   This happened recently about a
3 year, a year.
4  Q.   How did you learn this?
5  A.   Because my friends told me.
6 That did not make the papers, because they
7 got the guy who got his elbow dislocated, I
8 don't know.  I guess he didn't want to make
9 any problems.  He talked to Jimmy Warren.
10 Everything was completely, you know, taken
11 care.
12  Q.   Who were the friends that told
13 you this?
14  A.   I had so many friends, Counsel,
15 that told me.  People that I don't even know
16 the name.  I'm having a lot of memory issues
17 seriously.  People come forward.  They talk
18 to me.  Don't worry.  Call me.  And then if
19 I don't write the names, I forgot who the
20 number belongs to.
21  Q.   Do you remember the name of any
22 of the individuals who told you this
23 information about this incident?
24  A.   No.

202

M. GOMEZ

1  Q.   Do you know the name of the
2 barber shop proprietor?
3  A.   One of the guys that knew about
4 it was my wife's attorney, because she was
5 the one that told Awilda, and she told my
6 wife about it.
7  Q.   Which of your wife's attorneys?
8  A.   Janet.
9  Q.   The criminal attorney?
10 A.   Yeah, the criminal, right.
11 Q.   Anybody else, do you remember
12 any of their names who told you this
13 information or told your wife?
14 A.   Oh, no, that's about it.
15 Q.   What is the name of this man
16 who owned the barber shop?
17 A.   I have no idea.
18 Q.   Do you know the name of the
19 barber shop?
20 A.   No.  I just drive around.
21 Q.   Do you know where it's located?
22 A.   It's in Sleepy Hollow.
23 Q.   Can you tell me the street?
24 A.   In Cortlandt Street.

203

M. GOMEZ

1  Q.   Do you remember any other
2 incidents?
3  A.   Yes.
4  Q.   Go ahead.
5  A.   His name is Juni Torres.
6  Q.   Juni?
7  A.   Juni, yes, or something.  He
8 was a Village employee of Sleepy Hollow
9 worked in the sanitation department, got
10 into a problem with Detective Quinoy.
11 Because he took the stop sign a little bit,
12 and Detective Quinoy pull him over.  And I
13 don't know what words were exchanged.  He
14 cuffed him, and he broke his elbow and his
15 wrist while he was cuffing him behind his
16 back.
17     So, the guy lost his job due to
18 that, because you can't be arrested and be a
19 Village employee at the same time, and he
20 put a lawsuit on Sleepy Hollow.
21 Q.   When was this?
22 A.   That's recently also, a year
23 and a half, two years.
24 Q.   Before or after your arrest?

204

M. GOMEZ

1  A.   No, a little bit before, not
2 that long before, a little bit six, seven
3 months before mine.
4  Q.   How did you learn of this
5 incident?
6  A.   Oh, because I think he
7 contacted me, that guy.  After that, I never
8 spoke to him again.  And call me anytime you
9 need something, but I never call him back.
10     MR. YOUNG:  Off the record.
11     (Off-the-record discussion.)
12 Q.   By the way, going back to the
13 barber shop incident that you told us about,
14 what leads you to believe that Chief Warren
15 was aware of that incident or had any
16 involvement in it?
17 A.   Chief Warren is aware.  It's a
18 small Village.  It's a small Police
19 Department, and Chief Warren is aware of any
20 arrests that is being made in that
21 department.
22 Q.   Has anyone told you that he had
23 any involvement?
24 A.   Chief Warren?

205

M. GOMEZ

2  Q.   Yes.  Has anyone told you that
3  Chief Warren had any involvement?
4       A.   No, not really.
5       Q.   What about in this incident
6  with Mr. Torres; do you know what Chief
7  Warren's involvement was, if any?
8       A.   Well, it all started from the
9  beginning, Counselor.  By me saying that
10 Chief Warren let Detective Quinoy do his job
11 without impunity, without answering to
12 anybody except him.  Detective Quinoy is
13 just it's a loose cannon.  He pulled the gun
14 on his wife head, nothing's done about it.
15 He runs with absolute power in the Village.
16 He doesn't have to answer to anybody.
17           That's what leads to me from
18 the Chief.  If the Chief allows you to do
19 all those different actions, you know,
20 there's no repercussions about it, that you
21 can do whatever you want.  You have nobody
22 to put you in check.  And that's what it
23 leads to me, that everything has to do with
24 Jimmy Warren.  And I have another incident
25 --

206

M. GOMEZ

2  Q.   -- I'm going to stop you before
3  you go onto any other incident.  Do you have
4  any specific evidence, though, of the
5  Chief's involvement in this incident?
6       A.   I have the specific evidence of
7  -- there was a written letter given by Anna
8  Barreo, the lady who passed away of
9  Detective Quinoy being sexually harassed.
10      MR. YOUNG:  No, she's talking
11      about the barber shop.
12      A.   Oh, no.
13      Q.   You were going to go onto
14 another incident.
15      A.   Yes.
16      Q.   What was that?
17      A.   This recently happened after my
18 incident.  It happened August.  And there
19 was a sixteen-year old kid riding a bicycle
20 in Sleepy Hollow in Cortlandt Street.  And
21 Detective Quinoy tell him to stop because he
22 wanted to check that he had the right
23 paperwork for his bicycle.
24           So, the kid, he's about fifteen
25 or sixteen, he said, oh, no, this is my

207

M. GOMEZ

2  bike, and he started riding away, and he
3  started cursing.  So, Detective Quinoy and
4  the police officer, which I don't remember
5  his name.  He's the one that transported me
6  to the jail.  Chase him down the street and
7  knock him down, and Detective Quinoy order
8  that, order the police officer to tase him.
9  They tase the kid.  They arrested him.
10          Then him being a minor, they
11 have to give him medical treatment.  There
12 was a lot of commotion, a lot of the people
13 in the street and Hispanic people.  So,
14 there was a big crowd in the street, and
15 they were telling Quinoy, we know what
16 happened.  We know what you did.
17          And the Chief of Police came,
18 Chief Warren.  And the ambulance corps came,
19 which is Jimmy Hayes, okay.  And when Jimmy
20 Hayes got there and Jimmy Hayes told Jimmy
21 Warren we need this guy.  He's a minor.  We
22 use a taser on him.  We have to do a medical
23 treatment.
24          Jimmy Warren said, this guy
25 don't need to go anywhere except inside my

208

M. GOMEZ

2  cell, okay.  And then he was blaming, when
3  they started the investigation in the
4  newspaper, he was blaming the Chief of the
5  ambulance corps, which is James Hayes that
6  he refused to take the kid to the hospital.
7  And James Hayes said, no, you told me that
8  this kid is not going anywhere.  Where you
9  need to take him is to my cell.
10          So, they put him in the
11 ambulance to calm down the people who was in
12 the street.  They drove him around the
13 block, took him to back of the police
14 station.  Detective Quinoy got in the
15 ambulance and took those little spikes
16 himself.  When you got shot with the
17 electric gun, that goes into your skin.  And
18 then they have to remove that with a pin
19 setter.  And Quinoy was the one that went
20 and told the kid bend over, and with his
21 hands took that out with his hands himself.
22      Q.   Did you personally see any of
23 this?
24      A.   Oh, no, that was in the
25 newspaper.

209

M. GOMEZ

1
2    Q.    Other than reading it in the
3  newspaper, do you learn any information from
   any other source?
     A.    No. No.  No.
6        MR. YOUNG:  Wait, let me just
7    ask you a question.
8        (Whereupon, a discussion was
9        held off the record.)
10    A.    I had something else to add to
11  that incident, Counsel, if you want.
12    Q.    What did you have to add after
13  speaking with your attorney?
14    A.    That the kid's mother had a
15  problem with Detective Quinoy also four
16  years before that.
17    Q.    How do you know this?
18    A.    Because she goes to -- whenever
19  we got Criminal Court, she goes to the
20  courtroom and she talks to my wife.
21    Q.    This is this sixteen-year old
22  boy's mother?
23    A.    Yes.
24    Q.    Do you know her name?
25    A.    No.  I can't remember her name.

210

M. GOMEZ

2  She told me about three or four times
3  already, you know.
4    Q.    If we leave a blank in the
5  transcript, would you be able to fill in her
6  name?
7    A.    Sure.
8    _____
9        And Quinoy was making a little
10  bit of sexual advances on her, and she also
11  stated to my wife that she went to the
12  Police Department and put a complaint in.
13  What happened after that, I have no idea.
14  And all this is during the time that James,
15  Jimmy Warren is a Police Chief.
16    Q.    Any other reasons why you are
17  suing Chief Warren other than what you've
18  already told us about?
19    A.    I'm suing Chief Warren for all
20  those reasons, and also for him.  Actually,
21  I don't know if I should say that right
22  word, not being honest with the evidence in
23  trying to not doing the job that required of
24  him as a Police Chief.  And seeing because
25  the Police Department is to serve and

211

M. GOMEZ

2  protect the community.  Not to kill and
3  destroy the community.  And he's covering up
4  for Detective Quinoy up to the point that
5  he's unbelievably tremendous with all these
6  incidents.  And that's the reason that I
7  feel very strongly that he should be one of
8  the main ones, one of ones on the top of the
9  list in my opinion.
10        MR. YOUNG:  Okay.
11    A.    And --
12    Q.    -- I haven't asked you a
13  question at this point, okay.
14    A.    Okay, I'm sorry.
15    Q.    You said a minute ago and we
16  can read back the testimony if I'm not
17  recalling it correctly, that one of the
18  reasons you were suing Chief Warren was for
19  not being honest with the evidence; do you
20  remember saying that?
21    A.    Yes.
22    Q.    What evidence were you
23  referring to or what incident?  Basically
24  what I'm asking you, are you referring to
25  something with your case or something not

212

M. GOMEZ

2  related to your case?
3    A.    Well, with my case in him
4  covering everything up from the rest of the
5  cases.
6    Q.    What do you believe that Chief
7  Warren has covered up in your case?
8    A.    I had no specific proof that it
9  was him, because the one that was assigned
10  to the investigation was Lieutenant Barry
11  Campbell, and I highly doubt that Lieutenant
12  Barry Campbell is going to take a person
13  who's going to give testimony out of his
14  list.
15        The bottom line is Debra Lynn
16  made a statement, and when my Criminal Court
17  day that open findings the discovery about
18  the witnesses that were there, that name
19  should have been there.  That name did not
20  appear at all.  I don't think that would
21  have been able to be due process.  That
22  wouldn't have been able to be done without
23  his approval in my opinion.
24    Q.    But do you know that this
25  person's name was left out intentionally

213

M. GOMEZ

1
2  rather than by mistake?
3       A.   Oh, of course, it had to be
    intentionally, Counsel.  The same thing with
    the videotapes.
6       Q.   What are you referring to with
7  the videotapes?
8       A.   The videotapes were in front of
9  the Police Department are blurry.  They
10  don't appear.  You know, there should be
11  some videotapes from in front of the
12  building of the Police Department.
13       Q.   Have you seen any video of this
14  incident?
15       A.   No.
16       Q.   What leads you to believe then
17  that if there is a video that it is, in
18  fact, blurry?
19       A.   I'm referring to -- by the way,
20  the case was pushed out of Sleepy Hollow to
21  Greenburgh, and they didn't want it in
22  Sleepy Hollow, my case.
23       MS. SHERVEN:  I move to strike.
24       A.   I didn't say -- I'm sorry.
25       Q.   Okay, we're talking just about

214

M. GOMEZ

1
2  the video now.
3       A.   Okay.  The video, my wife's
4  lawyer and my criminal court attorney made a
5  --
6       MR. YOUNG:  -- let's not talk
7       about what the other attorneys are
8       saying.  That's privileged.
9       THE WITNESS:  Okay.
10       Q.   You said that you have not seen
11  any video, correct?
12       A.   No.
13       Q.   Has your wife seen any video?
14       A.   No.
15       Q.   Without going into details of
16  any conversation if this conversation was,
17  in fact, with your attorney, has anyone told
18  you that video exists but that it is blurry?
19       MR. YOUNG:  I don't want you to
20       say anything about what your
         attorneys told you, nothing.
22       THE WITNESS:  Okay.
23       Q.   You can answer the question.
24       MR. YOUNG:  He can answer the
25       question unless it calls for him

215

M. GOMEZ

1
2       imparting some information that was
3       told to him by one of his attorneys.
4       You know that.
5       MS. SHERVEN:  Right, I'm not
6       asking.  I believe my question was
7       very clear.  I said that I'm not
8       seeking any privileged information.
9       MR. YOUNG:  Can you answer that
10       question without referring to your
11       attorneys?  The question is has
12       anyone told you --
13       THE WITNESS:  No, no.  What I
14       was going to say about the video it
15       was when my criminal court attorney
16       said --
17       MR. YOUNG:  Then don't say
18       anything else.
19       Q.   Did anyone else tell you that
20  there is a video, but that it is blurry?
21       MR. YOUNG:  Anyone other than
22       attorney.
23       Q.   Other than an attorney?
24       A.   No.
25       Q.   Are there any other reasons why

216

M. GOMEZ

1
2  you are personally suing Chief Warren?
3       MR. YOUNG:  You just asked me
4       one before.
5       MS. SHERVEN:  Just not my
6       objection to Counsel reminding the
7       Witness.
8       MR. YOUNG:  This is going to
9       come out as a surprise at trial.  I
10       think I'm doing you a favor.
11       A.   Also, they had to do with
12  everything that's going on in the Village.
13  There was an elections.  That's why Sleepy
14  Hollow lost the privilege to do their own
15  elections.  They got have County Inspectors
16  now.  They had the Chief of Police counting
17  the votes.  And he was on television.  And
18  the machines -- they were tearing up the
19  paper, because he's very good friends with
20  the Mayor now.
21       So, what happens is they find
22  that when you have to present to the County,
23  that ballot was destroyed.  Also, the
24  absentee ballots of the person who was
25  running against the Mayor now who's very

217

M. GOMEZ

1
2  close friends with Jimmy, and they found it
3  in the garbage.  In the meantime, they
   opened for the Mayor, but the other ones you
   would find them in the garbage unopened.
6  They means they got disregarded.
7          Going back to the Mayor and the
8  Police Chief, there was an arrest made in
9  one of the parties, and teenagers, eighteen,
10 twenty, twenty-one.
11         And so they would find -- the
12 police came, Sleepy Hollow.  They found
13 drugs marijuana, cocaine.  When they
14 arrested the kids, they said who brought the
15 drugs?  Mayor Cicherelli's son.  Okay,
16 nothing was done to the kid.  The son of the
17 Mayor was not arrested, and he was not
18 properly charged.  He was not even brought
19 in to being questioned.  They found a lot of
20 cocaine, a lot of marijuana.  The other kids
21 were arrested.  I don't think that's fair.
22 Jimmy Warren's definitely.  Would his
23 connection with the Mayor have something to
24 do with it.
25     Q.   When is this incident that

218

M. GOMEZ

1
2  you're referring to?
3      A.   I got the police officer's name
4  who did the investigation.  I can't remember
5  now.
6      Q.   If we leave a blank for the
7  police officer who invested this, would you
8  fill it in?
9      A.   Yes.  Yes.
10 _____
11     Q.   Is the police officer who you
12 said investigated is he a Sleepy Hollow
13 Police Department?
14     A.   No.  This is all Sleepy Hollow,
15 No, this is all Sleepy Hollow, yes.
16     Q.   When was this incident that you
17 were just telling us about?
18     A.   I got it written down.
19 Probably a year, a year and a half.  I have
20 it written down.
21     Q.   If we left a blank in the
22 transcript for the approximate date, would
23 that also be something you could fill in.
24     A.   Yes.
25 _____

219

M. GOMEZ

1
2      Q.   When you were mentioning
3  earlier something about a voting machine,
4  when was that?
5      A.   That was in the last election,
6  when Cicherelli was running very closely,
7  and Jimmy Warren the Chief was counting the
8  votes.
9      Q.   Okay.  I'm just asking you
10 when.
11     A.   I'm sorry.
12     Q.   How did you learn that
13 information about the voting?
14     A.   Oh, that was in Channel 12 News
15 and in the newspapers, also.
16     Q.   Other than through the news,
17 whether the newspapers or television, did
18 you learn that information from any other
19 source?  Anyone tell you about it?
20     A.   No.  No.
21     Q.   Now, this incident with the
22 Mayor's son, how did you learn that
23 information?
24     A.   I learn it from a couple of
25 friends.

220

M. GOMEZ

1
2      Q.   Who?
3      A.   I can't remember their names
4  right now.
5      Q.   Were they members of the Police
6  Department?
7      A.   No.
8      Q.   The police officer who's
9  investigating that, have you spoken with him
10 about that incident?
11     A.   No.
12     Q.   Is there any other reasons why
13 you are personally suing Chief Warren?
14     A.   I have the Clerk in Sleepy
15 Hollow made a written formal complaint to
16 the County, who does the investigation in
17 the County -- the District Attorney about
18 his phone being tapped.  Jimmy Warren
19 tapping the phones for the -- the phone
20 being tapped.
21     Q.   What does that have to do with
22 your case?
23     A.   No, I'm not saying.  Everything
24 that is what I'm making a big thing.  The
25 same thing with the FBI investigation that's

221

1        M. GOMEZ
2  going on now. What I'm making a big circle
3  is going around to everything is connected
4  with Jimmy Warren. One things goes back in
5  circles and leads to the other. If he would
6  have done his job properly in my opinion as
7  an Chief and put a stop to that officer, it
8  would have been a lot of all the incidents
9  that could have been avoided. That's what I
10 was referring to. That everything is
11 connected, Counsel.
12      Q.    Any other reason why you are
13 personally suing Chief Warren?
14      A.    Not that I can remember
15 anymore.
16      Q.    You've also named Detective
17 Quinoy --
18      A.    Yes.
19      Q.    -- in this action? Why do you
20 sue him personally? We're talking again
21 about these individuals as individuals
22 versus suing just the Village of Sleepy
23 Hollow, so why sue him individually?
24      A.    Well, I'm suing him
25 individually for what he did to me. What he

222

1        M. GOMEZ
2  also did to -- I don't know if I should put
3  my wife in this?
4        MR. YOUNG: No. That's her
5     claim. Well, actually, you have part
6     of that claim, also, so.
7      A.    You know, for not I shouldn't
8  have said. It's not his friends don't have
9  anything to do with it. Because the guy
10 almost killed me, and he failed to do his
11 job properly as a detective, as a police
12 officer. It was unnecessary. It was a
13 tremendous amount of excessive use of force
14 and I got almost killed.
15      Q.    Just generally what type of
16 injuries did you sustain as a result of
17 this?
18        MR. YOUNG: This is immunity,
19     go ahead.
20      Q.    Let me ask the question another
21 way. You sustained injuries as a result of
22 this?
23      A.    Yes.
24      Q.    Or you're alleging that you
25 sustained injuries. What injuries are you

223

1        M. GOMEZ
2  alleging that Detective Quinoy, himself,
3  personally caused?
4        A.    Well, the bashing of my head,
5  the electricity, the punches, being kicked
6  after I was already cuffed, which is
7  definitely against any law enforcement
8  agency. After you get cuffed behind the
9  back, it's over. And for the abuses
10 physically and actually emotionally for me
11 being chased and followed by the Sleepy
12 Hollow Police Department whenever I have to
13 go to Sleepy Hollow. And my daughter being
14 followed late at night. And all these
15 mental -- not mental -- how do you call that
16 -- stress situation that I have been in
17 myself and my family. He's actually
18 responsible for all, everything.
19        Because if he would have talked
20 to me as a person, hey, Mario, come on. We
21 knew each other for a long time. Nothing
22 happened. Don't worry about it. It would
23 have been over. It would have definitely
24 been over, because I was not looking for any
25 problem.

224

1        M. GOMEZ
2        I already knew what was going
3  on with my daughter over a week and a half
4  ago, and I never went to chase him or look
5  for him.
6        MR. YOUNG: Okay, all right.
7      Q.    Any other reason why you're
8  suing him individually other than what
9  you've already told us?
10      A.    No, that's pretty much it.
11      Q.    What about Officer Ebel; why
12 are you suing him personally?
13      A.    Ebel just like Quinoy, he
14 almost killed me, and that was after I was
15 already cuffed. They did a very improper
16 arrest. That was not an arrest. That was a
17 gang fight. And the disrespect for me, for
18 my family, not only for me.
19        I identified myself of being a
20 retired law enforcement, and he say fuck
21 this department. This is Sleepy Hollow
22 Police, like, it's supposed to be a high
23 school fight. That's very much a reason
24 why, and he almost killed me.
25        He was just as bad as Detective

225

M. GOMEZ

1    M. GOMEZ
2   Quinoy when it came down electricity and
3   kicking my head, and putting a lot of
4   physical damage in my body.
5        Q.   When you just said damage to
6   your body, what damage to your body are you
7   specifically referring to that Officer Ebel
8   caused?
9        A.   Well, it was basically both
10  damages run together.  That Detective Quinoy
11  and Ebel did to me, they did it together.
12  So, I was in crutches.  I had to go two or
13  three times to the emergency room due to the
14  bad headaches that I had.  And I had the
15  worst headaches in my life for almost four
16  months after the fact.
17       I was sent to jail with no bail
18  for seven, eight days, no bail, like, one of
19  the worst criminals.  I don't think --
20       Q.   I'm going to stop you there
21  concerning bail.  I'm just asking you about
22  now injuries that you allege that Officer
23  Ebel caused?
24       MR. YOUNG:  Well, this is all
25       part of an arrest and being sent to

226

1    M. GOMEZ
2   jail.
3        MS. SHERVEN:  We're talking
4        about physical injuries.  We're not
5        talking about bail.
6        MR. YOUNG:  Okay.  You didn't
7        say that.
8        A.   Listen, on crutches for a week.
9   Taking medication up to this point for
10  headaches.  If I leave that medication, no
11  other the pills can control those headaches.
12  And it's been over a year, and I'm still
13  taking medication.  I was on crutches for a
14  week.  My right leg, it got very bad.  I
15  lost weight.
16       Being followed by Officer Ebel,
17  okay, around town, me and my friends we were
18  followed by him very closely while he was
19  talking on the radio and checking his
20  license plate on the computer, it was him.
21  No, that's not physical.  Sorry.
22       I mean, but I'm throwing
23  everything in there altogether.  All the
24  harassment, all that.  Every time he sees
25  me, he was following me around town, and

227

1    M. GOMEZ
2   being provoked, okay.  Because I have to
3   drive through Sleepy Hollow to go to Phelps
4   Memorial Hospital.  I have to cut through
5   there.  So, if I have to go to my doctor's
6   office to the neurologist, he has an office
7   in Sleepy Hollow and Ossining, so I have to
8   drive in Sleepy Hollow even if I don't want
9   to.  So, Ebel's involved in that.  That's
10  the reason I'm suing him also.
11       Q.   Now, you mentioned bail.  What
12  is your understanding as to how Officer Ebel
13  was involved in the bail that you got?
14       A.   No.  He was not involved in
15  that.  I shouldn't have said that.  It was
16  just, I don't know I was trying to be a
17  little -- you know put everything together.
18  You know, and everything that it had caused.
19       Q.   Were any police officers
20  involved to your understanding concerning
21  when you were given bail?
22       MR. YOUNG:  I'm going to object
23       to the form of that question.  I
24       don't know what that means.
25       Q.   Do you understand my question,

228

1    M. GOMEZ
2   Mr. Gomez?
3        A.   Well, no, my Counsel objected
4   so.
5        Q.   He says he doesn't understand.
6   Do you know what I'm asking?
7        A.   If I was think they were
8   playing any type of games?
9        Q.   All right.  Let me rephrase the
10  question then.  Are you alleging that any of
11  the police officers had any involvement in
12  the timeframe in which it took for you to
13  obtain bail?
14       A.   Yes.
15       Q.   Who are you alleging?
16       A.   I'm not saying -- I couldn't
17  say.  I was brought in from the shock, only
18  because they had to print my wife.  They
19  refused to give me water for almost three
20  hours.  I was put in the cell.  Then in the
21  morning they got me up.  You're going to see
22  the Judge.  It was 6:30 in the morning.
23       The two officers that were
24  escorting me were there.  I had already
25  spoken to Detective Chuck Sica.  He had

M. GOMEZ

1
2  printed me. He grew up with me. I had
3  already spoken to Barry Campbell.
        Now, once I'm getting
   transported to the jail, they take me to the
6  courtroom. The Judge you're been charged
7  with this, this, this, this. And when I
8  said, Your Honor. Don't open your mouth.
9  And the reason I cannot give you bail,
10 because I don't have your commitment papers,
11 so I can't give you any bail for that. I
12 said, okay.
13       I go in, and, okay, they
14 shackle me up. When I go to the squad car,
15 the two officers the driver and the one
16 giving me the escort. Officer Bennitas said
17 do you have the commitment papers. And the
18 other officer said, yes, it's here.
19       They had it all the time in the
20 squad car. They never gave the commitment
21 papers to the Judge. That way they know
22 that if the Judge don't have commitment
23 papers, she can't set bail on me. So,
24 that's why I know they were playing games.
25 That was done intentionally.

M. GOMEZ

1
2       Q.   Who were those officers that
3  you believe were involved in that?
4       A.   Counsel, I'm going to be honest
5  with you, that decision couldn't have come
6  from those two officers.
7       Q.   No, but I'm asking who are
8  those two officers.
9       A.   The one that transported me.
10      Q.   Right, what were their names?
11      A.   Officer Tony Bennitas, and it's
12 in the newspaper, because he's the one that
13 tasered the sixteen-year old kid. He was
14 the one that took me to the County Jail the
15 next morning.
16      MS. SHERVEN:  I'm move to
17      strike the portion that's not
18      responsive.
19      Q.   You said two police officers?
20      A.   Yes.
21      Q.   Do you know the name of the
22 other police officer?
23      A.   I have no idea, but I was
24 telling you he was the one that was involved
25 with Officer Quinoy in the tasing of the

M. GOMEZ

1
2  sixteen-year old kid a few months ago, so I
3  don't know.
4       Q.   Just so I'm clear, because I
5  think I misunderstood you then. Was Officer
6  Bennitas involved in that other incident, or
7  were you saying Officer Bennitas and this
8  officer who was involved?
9       A.   No, the officer who I don't
10 remember his name, that's the one that was
11 involved in tasing the sixteen-year old kid.
12 I know him by face, but I can't remember his
13 name.
14       And Bennitas asked the other
15 officer, do you have the commitment paper.
16 He said, yeah. It was under the visor.
17 They had it in there all the time. They
18 didn't give it to the Judge. That way they
19 know if I go in with no commitment papers, she
20 couldn't set bail on me. They wanted me to
21 go eight days without bail.
22       Q.   Did anyone specifically tell
23 you that they did not give the commitment
24 papers to the Judge for that reason, or is
25 this something, your suspicion?

M. GOMEZ

1
2       A.   Counsel, I was a Correction
3  Officer for over close to twenty years in
4  New York City. I know every Corrections is
5  inside and the police is outside. Every
6  trick in the book that you can --
7       Q.   But I'm asking you, did anyone
8  specifically tell you that?
9       A.   No, nobody told me that
10 personally, but I know that was done
11 specifically for that.
12       Q.   How much time passed until you
13 actually saw the Judge?
14       A.   I was printed, and I would
15 think it was about early 7:00 o'clock, a
16 little bit before 7:00.
17       Q.   Let me ask you that another
18 way. How much time passed from that time
19 you went to see the Judge and she said she
20 couldn't set bail because of no commitment
21 papers until bail was set?
22       A.   Oh, they set bail on my first
23 Court date.
24       Q.   How much time passed?
25       A.   About seven or eight days I was

233

M. GOMEZ

1  in jail. I was in the county jail, yes.
2
3       Q.    Do you know why so much time
4  passed? In other words, why you couldn't
5  see the Judge the next day or some other
6  day?
7       A.    No, I had no idea.
8       Q.    Now, the last police officer
9  that you have sued individually is Officer
10  Michael Gasker. Why did you sue him
11  personally?
12      A.    Because Officer Michael Gasker
13  was involved in the incident. He put the
14  electricity in me quite a few times. He was
15  involved with Detective Quinoy and that is a
16  reason that I'm basically putting his name
17  down.
18      Q.    Any other reason?
19      A.    He was there in the courtroom
20  in the morning, and 7:00 o'clock in the
21  morning, he was still there.
22      Q.    Are you talking about the first
23  time you saw the Judge or the second time?
24      A.    I only saw the Judge one time,
25  and I'm talking about before I went to jail.

234

M. GOMEZ

1
2  I saw the Judge again after, on the next
3  Court date after I came back from jail.
4       Q.    So, we're talking about that
5  first time?
6       A.    The first time, he was still
7  there. He knew -- he more or less has to
8  know what was going on. And I'm not saying
9  that he was directly involved, but he knows
10  what was going on. And if you're a police
11  officer, you got the right to say this is
12  not right. Even if it's his supervisor, I
13  don't think I'm going to be part of this.
14  And if he was part of that, that means that
15  he was involved in all the situation that
16  happened.
17      Q.    Any other reason you're suing
18  Officer Gasker?
19      A.    No. He --
20      Q.    Did you want to add something?
21      A.    Yes.
22      Q.    Okay, go ahead.
23      A.    At the beginning, at the
24  beginning it's been over a year, so it's a
25  long time, he was very no problems, but

235

M. GOMEZ

1
2  lately when I had seen him a few times in
3  town, he has been -- I was giving my dad a
4  ride to the hospital for an MRI, and I would
5  say that was a month and a half ago. And
6  Officer Gasker cut very abruptly in front of
7  me. He knows my truck, so I don't know if
8  he's looking for me to -- I don't know to do
9  something stupid or come out or say
10  something, and that's pretty much it. He
11  was not that way before. But when I see him
12  lately, he's been giving me like very
13  aggressive looks, like, dirty looks to see
14  if I'm going to respond in any type of
15  manner. You know, I guess it's all my --
16           But he was not doing that
17  before in the beginning. He's just
18  beginning to act this way at the end, right
19  now, the last couple of months.
20      Q.    And that is after -- just so
21  we're clear of this incident you're just
22  describing, that was after you named him in
23  the lawsuit?
24      A.    Oh, yes.
25      Q.    Recent?

236

M. GOMEZ

1
2       A.    Yes, this is just recent. I
3  think this is after the FBI investigation.
4  The FBI opened an investigation on the
5  Sleepy Hollow Police Department.
6       Q.    Have you spoken with anyone
7  from the FBI concerning this incident?
8       A.    Yes.
9       Q.    Who have you spoken with?
10           MR. YOUNG:  I'm going to direct
11  him not to answer.
12           THE WITNESS:  Okay.
13           MR. YOUNG:  There's an ongoing
14  FBI investigation, and I have been
15  told that he is not to speak to
16  anybody but the FBI about this.
17           THE WITNESS:  Sorry, I didn't
18  know.
19           MR. YOUNG:  You can take your
20  chances.  You want to call the Judge
21  and interfere in an FBI
22  investigation.
23           MS. SHERVEN:  Counsel, if you
24  can allow me to respond before you
25  jump the gun, here.

237

M. GOMEZ

2  MR. YOUNG:  Go ahead.

3  MS. SHERVEN:  I'm not sure what
you're referring to that the FBI has
told him not to speak to anyone about
6  this.  If you're referring
7  specifically to his conversations
8  with him or about this incident.
9  Obviously, if you're trying to say
10 that he's not supposed to be
11 testifying today, I'm not sure
12 exactly where you're going with that,
13 because obviously this deposition was
14 ordered by Judge Bryant and I don't
15 believe that the FBI has issued an
16 order or has gotten anther Judge to
17 issue and order saying that we cannot
18 proceed with this deposition today.
19    If you're simply referring to
20 the contents of any conversations
21 that Mr. Gomez may have had with an
22 investigator then, you know, I'll ask
23 you on the record and off the record
24 to provide us with the names of any
25 individuals, and I won't ask any

238

M. GOMEZ

2  individuals from the FBI that you
3  have had contact with, and I'm not
4  going to ask questions substantively
5  at this time during this deposition
6  concerning Mr. Gomez's involvement in
7  the FBI investigation.
8     MR. YOUNG:  So, what are you
9  looking for?
10    MS. SHERVEN:  So, if you can
11 provide me with the name.  That's all
12 I was asking was who the name was of
13 the FBI investigator.  That's the
14 only question I had asked.
15    MR. YOUNG:  I will provide you
16 with that at a later date.  I don't
17 have it off the top of my head.  My
18 understanding was it was a female.
19    MS. SHERVEN:  Is it your
20 understanding that the FBI doesn't
21 want him to speak about this incident
22 or about the substance of his
23 conversations with them?
24    MR. YOUNG:  Let's see.  Let's
25 see.  You represent the Village of

239

M. GOMEZ

2  Sleepy Hollow.  There is a Justice
3  Department and FBI investigation into
4  that department.  I don't really
5  think that the FBI would like Mario
6  to share the fruits of their
7  investigation with you as their
8  attorney.
9     MS. SHERVEN:  My question was
10 merely, without you needing to go
11 into any type of qualification of it,
12 my question was merely if it was your
13 understanding that he was not allowed
14 to speak about this incident, which
15 was the subject of this deposition
16 today, or merely about the content of
17 the investigation.
18    MR. YOUNG:  Well, let's see.
19 He's just spoken for the last several
20 hours about the incident here.
21    MS. SHERVEN:  Well, you're the
22 one who made this record, so I'm just
23 trying to make sure that you're not
24 going to say at some future date
25 that, oh, he was not supposed to

240

M. GOMEZ

2  testify about the contents of this
3  case.
4     MR. YOUNG:  I mean if I say
5  that, I say that.  We'll deal with it
6  at a later date.
7     While we are on the subject,
8  though, I would just like to say I
9  know your office conducted two days
10 of 50-h Hearings prior to this.  And
11 under the applicable case law, the
12 transcripts of those hearings are
13 private.  You may use them for
14 purposes of your investigation to
15 defend the civil lawsuit, but the
16 contents of those 50-h Hearings are
17 not to be shared with any other
18 parties.  And I am going on the
19 record now that if, and your office
20 is the only one that has them other
21 than my office, if they are shared
22 with any third-parties that opens up
23 the publication, people who publish
24 it, to serious issues, damages, and
25 Bar Association issues.

241

1          M. GOMEZ
2          MS. SHERVEN:  I believe at 50-h
3     Hearing will speak for itself, and it
.     is neither here nor there for this
      deposition.
6          MR. YOUNG:  Yes.
7          MS. SHERVEN:  All right, I have
8     no further questions at this time.
9          MR. YOUNG:  Okay.
10         (Time noted 3:05 p.m.)
11
12
13
          _____
14              MARIO GOMEZ
15
16    Subscribed and sworn to
17    before me this_____day
18    of_____, 2008.
19
20    _____
21       Notary Public
22
23
24
2⁵

---

242

C E R T I F I C A T E


STATE OF NEW YORK      )
                       )ss.:
COUNTY OF WESTCHESTER)


          I, NANCY P. TENDY, a Shorthand
Reporter and Notary Public within and for
the State of New York, do hereby certify:
          That MARIO GOMEZ, the witness
whose deposition is hereinbefore set forth,
was duly sworn by me, and that such
deposition is a true record of the testimony
given by the witness.
          I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no
way interested in the outcome of this
matter.
          IN WITNESS WHEREOF, I have
hereunto set my hand this 22nd day of
February, 2008.


          _____
          NANCY P. TENDY
          SHORTHAND REPORTER

---

243

REQUESTS

| | Page |
|---|---|
| Mr. Gomez's cell phone number at time of incident | 18 |
| Individual's name who was falsely arrested | 164 |
| Name of Rosa Negron's daughter | 178 |
| Production of any handwritten notes | 179 |
| Production of name, and Newspapers articles that | 196 |
| Name of sixteen-year old boy's mother | 209 |
| Name of police officer who invested | 218 |
| Name of FBI investigator | 238 |

---

244

ERRATA SHEET

          The following corrections, additions
or deletions were noted on the transcript of
the testimony which I gave in the
above-captioned matter held on 2/14/08:

Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____
Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____
Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____
Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____
Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____
Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____
Page____Line____SHOULD READ:_____
REASON FOR CHANGE:_____


          _____
              MARIO GOMEZ

Subscribed and sworn to
before me this_____day
of_____, 2008.

_____
   Notary Public