**3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
MARIO GOMEZ,

        Plaintiff,

    -against-       07 CIV 9310
                 (CLB)(GAY)

VILLAGE OF SLEEPY HOLLOW, DETECTIVE JOSE
QUINOY in his individual and official
capacity, POLICE OFFICER ELDRYK EBEL in his
individual and official capacity, POLICE
OFFICER MIKE GASKER in his individual and
official capacity, POLICE OFFICER RICHARD
D'ALLESANDRO in his individual and official
capacity, LIEUTENANT BARRY CAMPBELL in his
individual and official capacity, LIEUTENANT
GABRIEL HAYES in his individual and official
capacity, SERGEANT HOOD in his individual
and official capacity, CHIEF OF POLICE JIMMY
WARREN in his individual and official
capacity, and POLICE OFFICERS JOHN DOES
1-4,
        Defendants.
- - - - - - - - - - - - - - - - - - - X

HELD AT:    Young & Bartlett, LLP
          81 Main Street Suite 118
          White Plains, New York 10601
          February 14, 2008 10:15 a.m.

      Examination before Trial of the

Plaintiff, MARIO GOMEZ, pursuant to Court

Order, held at the above time and place

before a Notary Public of the State of New

York.

J & L REPORTING SERVICE
of Westchester, Inc.
200 East Post Road
White Plains, New York 10601
(914) 682-1888
Nancy P. Tendy, Reporter

---

**2**

A P P E A R A N C E S:


YOUNG & BARTLETT, LLP
   Attorneys for the Plaintiff
   Mario Gomez
Office & Post Office Address
   81 Main Street Suite 118
   White Plains, New York 10601
   BY:  FRANK YOUNG, JR., ESQUIRE


MIRANDA, SOKOLOFF, SAMBURSKY,
SLONE & VERVENIOTIS, LLP
   Attorneys for all Defendants
Office & Post Office Address
   The Esposito Building
240 Mineola Boulevard
   Mineola, New York  11501
   BY:  JENNIFER E. SHERVEN, ESQ.

---

**4**

                M. GOMEZ

  IT IS HEREBY STIPULATED AND

AGREED, by and between the attorneys for the

respective parties herein, that the sealing

and filing of the within deposition be

waived; that such deposition may be signed

and sworn to before any officer authorized

to administer an oath, with the same force

and effect as if signed and sworn to before

the officer before whom said deposition is

taken.


  IT IS FURTHER STIPULATED AND

AGREED, that all objections, except as to

form, are reserved to the time of trial.

1                M. GOMEZ
2       MARIO GOMEZ, residing at 100
3       Main Street, Apt. 3A,
4       Irvington, New York 10533-1754,
5       having been duly sworn by
6       Notary Public, Nancy P. Tendy
7       testified as follows:
8  EXAMINATION BY
9  MS. SHERVEN:
10     Q.  Good morning, Mr. Gomez.
11     A.  Good morning.
12     Q.  As you may remember we met
13  before at the 50-h Hearing that was held
14  previously in this case.  I'm an attorney
15  with Miranda, Sokoloff, Sambursky, Slone &
16  Verveniotis, and we represent the Defendants
17  in this Federal action that you have filed.
18     We are here today so that I can
19  ask you some questions in this Qualified
20  Immunity Deposition.  Now, please respond
21  verbally to all of my questions.  As you
22  know, the Court Reporter has to take down
23  everything that is said here so that we have
24  a record.  So, please, don't nod your head.
25  Just answer every question verbally, okay.

7

M. GOMEZ

2  medications that could affect your ability
3  to testify, any prescriptions that you
4  typically take that the failure to take
5  could affect your ability to testify?
6       A.   No.
7       Q.   In the last twenty-four hours
8  have you consumed any alcohol?
9       A.   No.
10       Q.   In the last twenty-four hours
11  have you consumed any illegal drugs?
12       A.   No.
13       Q.   In preparation for your
14  testimony here, today, did you review any
15  documents?
16       A.   No.  Basically I have a copy of
17  that 50-h Hearing that we did a year ago,
18  and I reviewed a little bit of that.
19       Q.   Other than that transcript, did
20  you review anything else?
21       A.   No, nothing else, nothing.
22       Q.   I'm just going to, I know it's
23  hard in normal conversation we talk over
24  each other, but please let me finish my
25  question before you answer even if you think

M. GOMEZ

1       A.   Yes.
2       A.   Yes.
3       Q.   If at any time you do not
understand my questions, please let me know
and I'll rephrase the questions so that you
6  do understand.
7            If at any time you need to take
8  a break, let me know, and we can do so with
9  the exception that I'll ask if I have a
10  question pending that you please answer the
11  question and then we can take a break, okay.
12       A.   Sure.
13       Q.   Do you have any physical or
14  mental conditions that could interfere with
15  your ability to testify accurately here,
16  today?
17       A.   No.
18       Q.   In the last twenty-four hours
19  have you taken any prescription medication
20  that could interfere with your ability to
21  testify?
22       A.   Well, I had taken prescription
23  medication, but it would not interfere.
24       Q.   Okay.  What prescription
25  medications have you taken?

6

M. GOMEZ

2       A.   Topamax.
3       Q.   That's a pain medication?
4       A.   That's for the headaches.
5       Q.   Any other medication that
6  you've taken in the last twenty-four hours?
7       A.   And Lexapro.
8       Q.   What is the Lexapro for?
9       A.   I was prescribed that.  I
10  thought I had a heart attack, and it was a
11  panic attack so.
12       Q.   Which doctor prescribed those
13  two medications for you or doctors?
14       A.   Doctor Schwartz is my
15  neurologist, and Doctor Soto.
16            MR. YOUNG:  One second.  Let me
17       just step outside.
18            (Whereupon, a discussion was
19       held off the record outside of the
20       room.)
21       Q.   Would either of those
22  medications interfere with your ability to
23  testify here, today?
24       A.   No.
25       Q.   Did you fail to take any

8

M. GOMEZ

2  you know what I'm going to say.  That way we
3  have the complete record.
4       A.   Sorry.
5       Q.   That's okay.  In preparation
6  for today, did you meet with your attorney?
7       A.   Yes.
8       Q.   Other than yourself and your
9  attorney, was anyone else present?
10       A.   No.
11       Q.   In preparation for your
12  testimony today, did you review any
13  videotapes?
14       A.   No.
15       Q.   Other than your attorney, did
16  you speak with anyone concerning your
17  testimony here, today?
18       A.   No.
19       Q.   What is your current address?
20       A.   100 Main Street, Apartment 3A,
21  letter A as in apple in Irvington, New York.
22       Q.   How long have you lived at that
23  address?
24       A.   About seven months, eight
25  months, around there.

9

M. GOMEZ

1    M. GOMEZ
2      Q.   Who did you live with at that
3  address if anyone?
4      A.   By myself.
5      Q.   What was your address before
6  you moved to 100 Main Street?
7      A.   You want me to say it?
8      Q.   Yes, please.
9      A.   100 -- I mean I'm sorry 1 River
10 Plaza, Apartment 4E, Tarrytown, New York.
11 10591 is the zip code.
12     Q.   Is that where you were living
13 as of October 2006?
14     A.   Yes.
15     Q.   Who did you live with at that
16 address?
17     A.   With my wife and my three
18 daughters.
19     Q.   I was going to say did all
20 three of your daughters live there, or a
21 couple of them were away at school at that
22 time?
23     A.   Well, one was away at school at
24 that time.
25     Q.   Just for the record, what is

11

M. GOMEZ

1    M. GOMEZ
2      Q.   What is her date of birth?
3      A.   July 13, 1984.
4      Q.   Is she your oldest daughter?
5      A.   Yes.
6      Q.   Which one is your middle
7  daughter?
8      A.   Stephanie Gomez.
9      Q.   What's her date of birth?
10     A.   January 19, 1988.
11     Q.   And your youngest daughter?
12     A.   Bridget.
13     Q.   What's her date of birth?
14     A.   August 15, '89.
15     Q.   Where is Awilda Gomez currently
16 living?
17     A.   On the River Plaza address, the
18 Tarrytown address.
19     Q.   Are any of your daughters
20 currently living there with her?
21     A.   Yes, my oldest daughter.
22     Q.   Haydee?
23     A.   Yes.  The other two are away at
24 school.
25     Q.   Mr. Gomez, are you currently

10

M. GOMEZ

1    M. GOMEZ
2  your wife's name?
3      A.   Awilda.
4      Q.   Gomez?
5      A.   Gomez.
6      Q.   What is her maiden name?
7      A.   Cadet C-A-D-E-T.
8      Q.   You're legally married to her?
9      A.   Yes.
10     Q.   What was the date of your
11 marriage?
12     A.   August 23, 1985.
13     Q.   You have three children with
14 Awilda Gomez?
15     A.   Yes.
16     Q.   What are their names again for
17 the record?
18     A.   Haydee Gomez, Haydee -- I'm not
19 going to -- you don't want the middle names
20 or anything like that?
21     Q.   No, that's fine.  If you could
22 give us their date of births that would be
23 helpful?
24     A.   Do you want me to spell Haydee
25 for you?  H-A-Y-D-E-E.

12

M. GOMEZ

1    M. GOMEZ
2  working?
3      A.   No.
4      Q.   You are retired; is that
5  correct?
6      A.   Yes.
7      Q.   Since October of 2006 until the
8  present time, have you been employed in any
9  capacity?
10     A.   No.
11     Q.   Have you ever been convicted of
12 a crime?
13     A.   No.
14     Q.   What is the date of your arrest
15 in Sleepy Hollow that is the subject of this
16 lawsuit?
17     A.   10-17 or 10-16, 2006.
18     Q.   Do you remember what day of the
19 week that was?
20     A.   Tuesday, Tuesday night.
21     Q.   In the twenty-four hours before
22 your arrest, had you consumed any alcohol?
23     A.   No.
24     Q.   In the twenty-four hours before
25 your arrest, had you consumed any illegal

13

M. GOMEZ

1
2  drugs?
3      A.  No.
4      Q.  In the twenty-four hours before
5  your arrest, did you fail to take any
6  medications that you typically were taking
7  at that time?
8      A.  No.  I was prescribed
9  medication, but I was a hundred percent.
10     Q.  You had taken the medication
11 that you were prescribed at that time?
12     A.  Yes.
13     Q.  What medication were you taking
14 as of October 17, 2006, or the types of the
15 medication if you don't recall the exact
16 name?
17     A.  I don't recall.  I don't recall
18 the exact names.  I would have to look.
19     Q.  Do you recall what the
20 medications were for generally?
21     A.  Well, I was going to my
22 psychiatrist.
23     Q.  Had the psychiatrist prescribed
24 any medication?
25     A.  Yes.  I was prescribed some

14

M. GOMEZ

1
2  medication, because remember the problem
3  that I had talked to you about the
4  depression, and I find out I had hepatitis
5  C.  I was taking a lot of medication for the
6  liver.  I was taking a whole combined
7  different medication.  And I had the problem
8  with the liver, the hepatitis C.  And I was
9  taking medication for that over a year.  And
10 I did that twice for two years as a matter
11 of fact.
12          I had taken so much medications
13 that, you know, it's not really that I can
14 remember all of them really, you know.
15     Q.  What was the name of your
16 psychiatrist as of October 2006?
17     A.  Doctor Soto.
18     Q.  The same doctor that you've
19 said before?
20     A.  The same doctor, yes.
21     Q.  The doctor who prescribed the
22 medication for your hepatitis C and other
23 problems associated with that condition, was
24 that Doctor Schwartz that had prescribed
25 those medications?

15

M. GOMEZ

1
2      A.  No.  That's the neurologist
3  after the incident.
4      Q.  Who was that doctor then?
5      A.  Doctor Chia.
6      Q.  Could you spell that?
7      A.  It's David is the first name,
8  and Chia is C-H-I-A.
9      Q.  Other than medication for what
10 you told us was depression, did your
11 psychiatrist prescribe any other medication
12 at that time?
13     A.  I think he prescribed -- he had
14 switched up and down I think ever since that
15 I was hospitalized because due to the
16 Hepatitis C, due to that I was hurt in the
17 line of duty in the Corrections Department
18 in Riker's Island, and during the incidents
19 that arise in the 1980's, I've been seeing
20 the psychiatrist --
21     Q.  Let me just stop you there and
22 just ask you to just to answer the question.
23     A.  Well, no, I'm giving you my
24 answer.
25          MR. YOUNG:  No.  No.  Hold on.

16

M. GOMEZ

1
2      Q.  We don't want to be here all
3  day.
4      A.  No, I know.  That's my answer.
5  I have to give you the explanation why I'm
6  taking all those medications.
7      Q.  Actually, right now I'm not
8  asking you why, though.
9          MR. YOUNG:  Don't worry, we'll
10         get to that, you and I will get to
11         that later.
12     Q.  We'll get to that.  And I
13 appreciate that you're being forthright and
14 trying to give us as much information.  But
15 right now, I just want to have you answer
16 the specific question as to what medications
17 the psychiatrist had prescribed at that time
18 or for what condition?
19     A.  I have no idea.  I would have
20 to check on that.  He goes up and down.
21 Ever since I was hospitalized.  I've been
22 seeing him like once a month.
23         MR. YOUNG:  Okay, your answer
24         is you don't know, so that's fine.
25         They'll get his records.  They'll

**17**

**19**

M. GOMEZ

1           M. GOMEZ
2    find out that way.
3       Q.   At the time of your arrest,
4   where were you?
5       A.   Home.
6       MR. YOUNG:   Listen to the
7   question again.   At the time of your
8   arrest.
9       Q.   At the time of the arrest when
10   you were arrested in the Village of Sleepy
11   Hollow, where were you physically?
12       A.   On the street in Beekman
13   Avenue.
14       Q.   Is that in front of the Sleepy
15   Hollow Police Department?
16       A.   Yes.
17       Q.   How did you come to be in front
18   of the Sleepy Hollow Police Department that
19   night?
20       A.   Well, I received a phone call
21   from Detective Jose Quinoy in my personal
22   cell.
23       MR. YOUNG:   Okay, that's your
24   answer.
25       Q.   I thought, perhaps, you were

1           M. GOMEZ
2   Detective Quinoy?
3       MR. YOUNG:   Off the record.
4       (Off-the-record discussion.)
5       MR. YOUNG:   This is a Qualified
6    Immunity Deposition, and I think
7    there are parameters to the
8    deposition.
9       The Defendants have already had
10    two extensive days of deposition
11    testimony in the form of a 50-h
12    Hearing, so there's no secret as to
13    what happened here.
14       I just ask that Counsel be
15    aware of the parameters of this
16    deposition and confine her inquiry to
17    within those rules.
18       Q.   Approximately, what time did
19   you receive a phone call from Detective
20   Quinoy?
21       A.   Well, I received the first
22   phone call about -- I was with my daughter
23   Bridget.
24       MR. YOUNG:   Hold on.   Hold on.
25    The only question here is what time.

**18**

**20**

1           M. GOMEZ
2   saying something else, so.
3       You said that you received a
4   call from Detective Jose Quinoy at that
5   time?
6       A.   Yes.
7       Q.   That was on your personal cell
8   phone?
9       A.   Yes.
10       Q.   Now, what was your cell phone
11   number at that time?
12       A.   I change it after that.   It was
13   914 -- I'm forgetting everything.   914 -- I
14   can't remember now.
15       MR. YOUNG:   We can leave a
16    blank in the transcript.
17       MS. SHERVEN:   We'll leave a
18    blank in the transcript for you to
19    fill that in or I'll ask you to
20    please provide your telephone number
21    at that time to your attorney so that
22    it can be provided to us.
23       A.   _____
24       Q.   Approximately, what time was it
25   that you received a phone call from

1           M. GOMEZ
2       She didn't ask you who you were with.
3       A.   Oh, okay.   Well, the first call
4   I didn't get.   The second one it was about
5   9:45, around there, approximately.
6       Q.   The second phone call did you
7   actually speak with Detective Quinoy?
8       A.   Yes, I did.
9       Q.   Were you at home at that time?
10       A.   Yes.
11       Q.   What did you say to Detective
12   Quinoy during that phone call?
13       A.   No.   He started talking first.
14   He stated to me.
15       Q.   All right.   What did Detective
16   Quinoy first say to you, since you said that
17   he spoke first?
18       A.   Oh, Mario, I needed to talk to
19   you.   I heard that you wanted to talk to me.
20   And I said, well, that's how the whole thing
21   -- I said, okay, Jose, 'cause I call him by
22   Jose, because he was my neighbor for years
23   and personal friend of the family.
24       So, the bottom line is to make
25   a long story short he said, I approach him

21

M. GOMEZ

2 about rumors that I heard that he was going
3 out with my daughter. Keep going?
        Q.   Is there more? Did you want to
.. add something to that?
6           MR. YOUNG:  Are you asking him
7      for the first sum and substance.
8           MS. SHERVEN:  I'm asking him
9      for the first portion of this
10     conversation.
11          MR. YOUNG:  The first portion,
12     okay.
13     Q.   Was there anything else during
14 that first --
15     A.   No.  Basically, it was all one
16 big conversation.
17     Q.   Okay, tell me the sum and
18 substance then of that conversation?
19     A.   Okay.  From there, we started
20 talking.  And I told him, you were a
21 personal friend of the family, and I know
22 your wife.  I know your kids.  For a very
23 long time, you were a neighbor here, and I
24 heard that you're going out for drinks and
25 to bars with my daughter, not with people,

22

M. GOMEZ

2 but by yourself and her..
3           And then he said, oh, those are
4 the two Irish mother fuckers.  He say that
5 to me in Spanish.  That Lieutenant Hayes and
6 Michael Hayes are envious of me and are
7 always talking shit about me.
8           And then I told him, well,
9 that's besides the point.  'Cause he wanted
10 to know he told me.  And I said that's
11 besides the point.  You know, I'm not going
12 to give you that information.
13          Then he told me, oh, you know,
14 your daughter was a bartender.  I said, no,
15 she was not a bartender, but what does that
16 have to do with it.  So, he kept going on,
17 and then he tells me, he tells me that I
18 told him -- hold on a minute.  He tells me,
19 oh, don't worry about it.  And I say, I have
20 to worry about it, because your wife already
21 have problems and fights in the Village of
22 Sleepy Hollow with all women because of you
23 dating her, and I have to worry about it.
24          And then he tells me -- there's
25 a piece that I'm missing, and I'm trying to

23

M. GOMEZ

2 remember.  To make a long story short, he
3 told me -- I told him, I said, Jose, also,
4 by the way, I heard that you said that
5 before you were switching shift, you said to
6 all the police officers on duty before you
7 were going out, that you were going out with
8 my daughter.  And why not, when I get paid
9 for food and drinks, why not.  I have to
10 take that chance.
11          And I told him that was very
12 bad.  I told him, you know, a guy don't do
13 that.  You know, and that's what I told him.
14 And then he got upset, and he told me, well,
15 let me tell you.  Your daughter's twenty-one
16 years old, and you're not going to tell me
17 what to do with your daughter.
18          And then I told him, hey, how
19 can you tell me that when you know me for so
20 many years, okay, and you were a personal
21 friend of the family.  You've been at my
22 fortieth birthday party.  You know my
23 daughter since she's twelve, thirteen years
24 old, ten.  How can you tell me that?  How
25 can you be such an asshole.  You know, I

24

M. GOMEZ

2 don't know.  I forgot what I said really.
3 He told me, well, you're not going to tell
4 me what to do with your daughter.  If you
5 are machito, he told that to me in Spanish.
6 If you are macho, you got cojones which
7 means balls.  If you're a macho guy and you
8 have balls, come down and meet me in front
9 of the station.  That was the end of the
10 story.
11     Q.   Approximately how long was this
12 phone conversation?
13     A.   About, I mean I was in my
14 bedroom.  My daughter was in the living
15 room.
16     Q.   But approximately how long?
17     A.   About five minutes, six
18 minutes, seven minutes.  I can't really --
19 no longer than eight minutes.
20     Q.   At any point during this
21 conversation with Detective Quinoy, did he
22 make any threats towards you?
23     A.   Not that I can remember, no.
24     Q.   At any point during this
25 conversation with Detective Quinoy, did you

25

M. GOMEZ

1
2 make any threats towards him?
3     A.   No, I did not, no.
4     Q.   Did you say to Detective Quinoy
that you were going to "Kick his fucking
6 ass"?
7     A.   No.  No, I did not.
8     Q.   Why didn't you just hang up the
9 phone during the conversation?
10        MR. YOUNG:  I'm going to object
11        to the form of that question.
12     Q.   During this telephone
13 conversation, why not just hang up the phone
14 if you didn't want the conversation to
15 continue?
16        MR. YOUNG:  I'm going to object
17        to that question again.  We're here
18        for factual -- this is -- it's an
19        argumentative question.  I don't
20        think it has any part in a
21        deposition.
22        MS. SHERVEN:  Counselor, I mean
23        the Federal rules apply.  I can ask
24        him any question.  If you object to
25        the form, I'm happy to rephrase the

26

M. GOMEZ

1
2 question.
3        MR. YOUNG:  Could you rephrase
4        the question.
5        MS. SHERVEN:  But otherwise I
6        expect that you will not be directing
7        him not to answer.
8        MR. YOUNG:  Well, I'm objecting
9        to the form of that question.
10     Q.   During this conversation, why
11 didn't you just hang up the phone and put a
12 stop to the conversation?
13     A.   The reason why is because he's
14 a man that I knew way before he was a police
15 officer.  I know his whole family.  I know
16 his wife's family.
17        MR. YOUNG:  Hold on.  Hold on.
18        Let's not go too broad.  The question
19        why didn't you just hang up?
20     A.   He was dealing about my
21 daughter.  I know already his wife with
22 personal fights with all the women, and I
23 was trying to avoid that to happen.
24     Q.   When you hung up the phone with
25 Detective Quinoy, what did you do next?

27

M. GOMEZ

1
2     A.   I started getting dressed, and
3 that's when my wife arrived.  Bridget had
4 called my wife.
5     Q.   Why did you start getting
6 dressed?
7     A.   To go to the police station and
8 see, to talk to him and settle the
9 situation.
10     Q.   Why didn't you just stay home
11 and let the situation blow over?
12     A.   Because I had already did that,
13 Counselor, two weeks before that, and the
14 situation could carry on.
15     Q.   Did Awilda try to stop you from
16 leaving the house?
17     A.   She came.  She was in her
18 friend's house, neighbor's.
19        MR. YOUNG:  Hold on.  Hold on.
20        She didn't ask you where she was.
21        Simple question.  Did she try to stop
22        you from leaving the house?
23     A.   Sorry.  Okay, no, we spoke.  I
24 don't remember if she told me to stay or go.
25 We made an agreement to go together and talk

28

M. GOMEZ

1
2 to Quinoy together as a family.
3     Q.   When you say as a family, do
4 you mean just you and Awilda or some your
5 children as well?
6     A.   No, just me, parents.
7     Q.   Did you actually go to the
8 police station together in the same vehicle?
9     A.   Different vehicles.
10     Q.   Why did you take different
11 vehicles?
12     A.   I have no idea, Counselor.  It
13 just came up that way.  I went down first,
14 and then she came after me.  She was talking
15 to Bridget a little bit, and it was one of
16 those things I can't explain.
17     Q.   Approximately how long was the
18 drive from your home to the police station?
19     A.   Two minutes, two.  It's the
20 next town over.
21     Q.   When you arrived at the police
22 station, did you see anyone outside of the
23 police station?
24     A.   Yes.
25     Q.   Who did you see?

29

M. GOMEZ

2    A.    Detective Quinoy and Officer
3 Michael Gasker.
       Q.    Did you know Officer Gasker
prior to the date of your arrest?
6    A.    No.
7    Q.    When you got to the police
8 station, where did you park your car?
9    A.    Legally parked, I find a
10 parking spot. I park, and it was about
11 five, seven feet away from the main entrance
12 of the police station.
13    Q.    When you first saw Detective
14 Quinoy, where was he physically located?
15    A.    He was standing right in the
16 sidewalk right in front of the door of the
17 police station.
18    Q.    Is there a sidewalk in front of
19 the police station?
20    A.    Yes.
21    Q.    Approximately how close is that
22 sidewalk to the entrance of the police
23 station?
24        MR. YOUNG:  Okay, if you can
25    answer the question.  How close is

30

M. GOMEZ

the sidewalk to the door?
2    Q.    How close is the sidewalk to
3 the door.
4    A.    Where he was standing to the
5 door?
6    Q.    Right.
7    A.    About from here to the main --
8 five feet, maybe, seven feet away.
9    Q.    The main sidewalk I'm guessing
10 in front of on the block in front of the
11 police station; am I correct in that
12 description?
13    A.    Well, here's the sidewalk.
14 Here's the street, Beekman Avenue.
15    Q.    So, there was a sidewalk
16 running parallel to the street?
17    A.    Yes.
18    Q.    Is there also a sidewalk
19 leading into the police station, kind of
20 like perpendicular?  Or I'm trying to get a
21 picture of what the front of the police
22 station looks like.
23    A.    You're talking about a little
24 alleyway they have?

31

M. GOMEZ

2    Q.    Is there a little sidewalk?
3    A.    No, he was not standing there.
4 He was standing in the main street right
5 facing the street in front of the door of
6 the Police Department.
7    Q.    Because you had said he was in
8 front of the door.  You don't mean that he's
9 physically in front of the door?
10    A.    Not physically in front of the
11 door.  He was on the sidewalk.  I could say
12 that this is the sidewalk.  I'm standing
13 here, and the front door is a little bit you
14 know where you were sitting, waiting.
15    Q.    Unfortunately, the record's not
16 going to be clear as to that description.
17    A.    I would say ten feet away, ten
18 feet away.  The main door is ten feet away
19 from where he was standing.
20    Q.    Just so the record's clear,
21 Detective Quinoy when you first saw him was
22 standing approximately ten feet away from
23 the front door?
24    A.    Eight, ten, I'm not sure,
25 maybe, a little closer.

32

M. GOMEZ

2    Q.    Approximately that distance
3 from the front of the door, but on the
4 actual sidewalk that runs parallel to the
5 street?
6    A.    On the sidewalk, right.
7    Q.    Where was Officer Gasker in
8 relation to Detective Quinoy when you first
9 got to the police station?
10    A.    They were both standing
11 together.  Officer Gasker was standing next
12 to him.
13    Q.    When you first saw them, what
14 happened next?
15    A.    Parked the car.  My wife was
16 parked right -- she couldn't find a parking
17 space, so she left the car running, and she
18 was parked in the street right parallel to
19 me.  So, she was right next to me.  I did
20 park legally.  I had a legal parking space.
21        I parked the car.  Shut the car
22 off, and I came out of the car.  And I was
23 expecting my wife to come out, also.  She
24 was out already of the car, and we were
25 going to talk to Quinoy.

M. GOMEZ

2  Q.  After you and your wife parked
3 your cars, did you have a conversation
4 before speaking at all or having any
5 interaction with Detective Quinoy?
6  A.  Are you referring my wife and
7 I?
8  Q.  You and your wife.
9  A.  When we were already parked
10 you're saying?
11  Q.  Right, after you parked your
12 cars, did you speak with her at all?
13  A.  No.  I didn't get the
14 opportunity.  No, we had no chance.
15  Q.  When you got out of your car,
16 did you have anything in your hands?
17  A.  No.
18  Q.  Were you carrying anything on
19 your person?
20  A.  No.  My keys, my wallet, and
21 some personal items, some personal things.
22  Q.  When you got out of the car,
23 did you close the car door?
24  A.  The car was parked.  I put it
25 in drive.  I shut the engine off, and I had

M. GOMEZ

2 the keys in my pocket.
3  MR. YOUNG:  You put it in what?
4  A.  Sorry.  I park.  Put it in
5 park.  Shut the engine off.  Put the keys in
6 my pocket, and I stepped outside the car,
7 and I was standing right next to my car.
8 That's it.
9  Q.  Did you close your car door
10 though after you exited?
11  A.  Yes, it was.  Yes, the car was
12 parked legally in a legal parking space.
13  Q.  When you exited your vehicle,
14 did you say anything to Detective Quinoy or
15 Officer Gasker at that time?
16  A.  No.
17  Q.  Did either of them say anything
18 to you?
19  A.  Yes, Detective Quinoy.
20  Q.  What did Detective Quinoy say.
21  A.  Police, don't move.  Don't
22 fucking move, because he was cursing.  Put
23 your fucking hands up in the vehicle.  And
24 he came charging, running towards me.
25  Once he got to me, he banged me

M. GOMEZ

2 against the car when I had already turned
3 around.
4  Q.  I'm going to stop you.  Right
5 now, I just asked you what he had said.
6  A.  All right.
7  Q.  Did Detective Quinoy say
8 anything else at that time other than what
9 you've just told us?
10  A.  No.
11  MR. YOUNG:  Before there was
12 contact you mean?
13  MS. SHERVEN:  Before there was
14 contact.  I'm talking about the first
15 thing he said.
16  Q.  Did Officer Gasker say anything
17 to you at that time?
18  A.  No.
19  Q.  Were there any other police
20 officers or civilians in the area other than
21 you, your wife, and the two police officers?
22  MR. YOUNG:  That he saw?
23  Q.  That you saw?
24  A.  That I saw, no, that's it.
25  Q.  When Detective Quinoy said,

M. GOMEZ

2 don't move, to put your hands up, what, if
3 anything, did you say to him?
4  A.  I had my hands up on the
5 vehicle.  He was already pushing me and
6 hitting me, so I had my hands up on the
7 vehicle, and I just slightly turned around
8 and said, hey, I thought we were going to
9 talk.  And that's when he boom he hit me
10 right here in the head with the cuff.  He
11 had a cuff in his hand.
12  MR. YOUNG:  Indicating the left
13 side of the head.
14  Q.  What did you say, though?
15  A.  Hey, I thought we were going to
16 talk.
17  Q.  Did you say anything else other
18 than, hey, I thought we were going to talk?
19  A.  No.  That's the only thing that
20 I said.  That's pretty much it.
21  Q.  During these initial moments,
22 did your wife say anything to anyone?
23  A.  No.  She was just standing
24 right a little bit away from next to me, a
25 little bit behind, maybe, two, three feet

37

M. GOMEZ

2 away.

3     Q.   When Detective Quinoy said,
don't move, to put your hands up, what, if
anything, did you physically do?

6     MR. YOUNG: Again, that's not
7     all he said. You're leaving out some
8     expletives but that's okay. Can you
9     read back the question. I'm sorry.
10     (Whereupon, the reporter read
11     back the requested material.)
12     A. I put my hands up on the
13 vehicle.
14     Q. Where on the vehicle did you
15 put your hands up?
16     A. Well, I have a truck, so it's
17 kind of tall, so I had my hands up. It's
18 not -- so, I was not actually on the
19 driver's door, on the second door in the
20 passenger side door, but on the driver's
21 side.
22     MS. SHERVEN: Can you read that
23     back, please.
24     (Whereupon, the reporter read
2⁵     back the requested material.)

38

M. GOMEZ

2     MR. YOUNG: You mean the rear
3     door.
4     A. The rear door. I'm sorry. Not
5 the passenger's side. The passenger's side
6 on the rear door behind the driver's seat.
7     MR. YOUNG: Indicating that
8     your hands were above your head.
9     THE WITNESS: Yes. I had them
10     on the vehicle.
11     Q. Did you have your hands
12 outstretched, or were they like in a fist or
13 some other position; if you can?
14     A. I mean they were --
15     MR. YOUNG: Indicating flat
16     hands.
17     A. Yeah, flat hands, flat hands.
18 I didn't make any fists or any motion of,
19 you know.
20     Q. At the time that you put your
21 hands up in the manner that you've
22 described, which direction were you looking
23 in?
24     A. Well, I had my hands up,
25 looking away from -- he's on my back, okay.

39

M. GOMEZ

2 And he was pushing me. He was banging me.
3     MR. YOUNG: Wait. The question
4     is: Where were looking when you put
5     your hands up?
6     A. Sorry. Yes, I had the hands up
7 on the vehicle, and I was looking the other
8 way, and he was behind me.
9     MR. YOUNG: Indicating you were
10     looking at the vehicle, your car.
11     THE WITNESS: Exactly, yes,
12     yes, yes.
13     Q. Did you see Detective Quinoy or
14 Officer Gasker approach you?
15     A. Well, of course, I did. I saw
16 mainly Detective Quinoy. He was charging to
17 me towards me.
18     Q. How were able to see them? If
19 you're looking in the direction in front of
20 you, how were you able to physically see
21 them.
22     MR. YOUNG: As I understand the
23     testimony, he saw them running to him
24     before he --
25     MS. SHERVEN: -- Counselor,

40

M. GOMEZ

2 with all due respect.
3     MR. YOUNG: Because you're
4     confusing -- with all due respect
5     you're confusing the record. We can
6     go back and read this again, because
7     it is clear to me that before that
8     time happened -- if you want to go
9     back because, look, I looked at the
10     50-h Hearings that you did for two
11     days, and those two records are a
12     mess, because you kept going back and
13     asking the same questions over and
14     over again. I don't mean to get
15     personal, but he already testified
16     that as soon as he got out of the
17     car.
18     MS. SHERVEN: Counselor, I'm
19     going to stop you. I don't
20     appreciate the fact that you've
21     interrupted me and you're also --
22     MR. YOUNG: -- because you're
23     messing up the record.
24     MS. SHERVEN: Excuse me,
25     Counselor.

41

M. GOMEZ

2   MR. YOUNG:  Excuse me.

3       MS. SHERVEN:  Would you please
stop interrupting me when I'm
speaking.  You've interrupted me
6   several times now.  I really don't
7   appreciate that.

8       MR. YOUNG:  No, I have not.  I
9   like a clear record.

10      MS. SHERVEN:  And the fact is
11  you're doing speaking objections, and
12  it's completely inappropriate in this
13  matter.

14      MR. YOUNG:  You're not making a
15  clear record.  We can go back, and
16  the reporter can read what he's
17  already testified to if you don't
18  understand.  And I'm not doing a
19  speaking objection.  If you don't
20  understand how he saw these men,
21  okay, we can go back and read his
22  answer, because it's very clear how
23  he saw those men.  He's already
24  testified to.

25      MS. SHERVEN:  No.  I can ask

42

M. GOMEZ

2   any questions that I want to.

3       MR. YOUNG:  You cannot ask the
4   same questions three or four times.

5       MS. SHERVEN:  I'm asking him a
6   specific question as to how he saw
7   the men.

8       MR. YOUNG:  Okay, go ahead.
9   Answer that question.  How did you
10  see the men?

11      Q.   How did you physically see the
12  police officers at the time?

13      A.   I saw the police officers
14  before I put my hands -- he came -- we got
15  to go back a little bit, Counsel, hold on.
16  I'm not trying to make this long, but I got
17  to explain to you.

18      I come and I park my car.  I
19  get out of the vehicle.  When I park my car,
20  Detective Quinoy and Police Officer Michael
21  Gasker was standing right in the sidewalk in
22  front of my vehicle.

23      I got out of the car, he starts
24  running towards me, charging.  He tells me,
25  don't fucking move.  Police.  Don't move.

43

M. GOMEZ

2   Put your fucking hands up on the car.
3   That's exactly what I did.  I saw him.  He
4   was already I had already saw him charging
5   me.  That's how I tell you that I saw him.

6       Q.   Was Officer Gasker also running
7   in the manner that you've described?

8       A.   I don't remember.  The only one
9   that I really concentrated was on Detective
10  Quinoy.  I don't know if he was running or
11  he was standing, or if he even came walking.

12      Q.   When you saw Detective Quinoy,
13  was he holding anything in his hands?

14      A.   I think he was holding either
15  cuffs, or he was holding something, or the
16  radio or something, because when he hit me
17  in the head, it was with something hard.

18      MS. SHERVEN:  I move to strike
19      the portions that are not responsive.

20      Q.   Did you see anything in
21  Detective Quinoy's hands?

22      MR. YOUNG:  As he was running
23      to him?

24      Q.   As when you first saw him until
25  the time that you had physical contact?

44

M. GOMEZ

2       A.   Yes.  He had I believe the
3   cuffs in his hands.

4       Q.   In which hand did he have the
5   cuffs that you've described?

6       A.   I'm going to assuming it had to
7   be --

8       MR. YOUNG:  No.  No.  Do not
9       assume.  If you recall, you recall.
10      If you don't, you don't.

11      A.   I don't know what hand he had
12  it, but when I got hit, it must have been
13  with his left hand.  Because I got hit in
14  the left side of the head when I was turning
15  around asking him, I thought we were going
16  to just talk.

17      MS. SHERVEN:  I move to strike
18      the portions that are nonresponsive.
19      Just listen to my question.

20      A.   No.  That was my answer,
21  Counselor.  When I tell you something you
22  don't like, you --

23      Q.   -- but I asked you specifically
24  which hand, okay.

25      A.   Okay.  That's all right.

45

M. GOMEZ

1
2      MR. YOUNG:  Here's the thing.
3  You don't have to think out loud
4  before you give us an answer, which
5  is what you're doing.  You answer was
6  left hand, but you thought out loud
7  for a minute before you gave an
8  answer.  Think to yourself, and then
9  give an answer if you can.
10      THE WITNESS:  Okay.
11     Q.   Did you see Officer Gasker
12  holding anything in his hands when you first
13  saw him?
14     A.   No.
15     Q.   You've already described the
16  fact that you had your hands up on the car,
17  and Detective Quinoy is coming towards you
18  from behind your back?  Am I describing that
19  correctly; that your hands are up on the
20  car, and he's coming towards you but your
21  back is to him?
22     A.   No, it's not, Counsel.  No.
23  Let me go back a little bit.
24      MR. YOUNG:  No.  She'll
25  rephrase the question.

46

M. GOMEZ

1
2     Q.   At the time that Detective
3  Quinoy is coming towards you in the manner
4  that you've described, are you facing the
5  vehicle, or do you turn to face the vehicle
6  at some point in time?
7     A.   I get out of the car.
8      MR. YOUNG:  See, this is what I
9  want to avoid, because when I looked
10  at the 50-h, it's four times as long
11  as it should, because you keep coming
12  back and asking him the same
13  questions over and over.  And I'm not
14  going to let him answer these
15  questions three and four times.  He's
16  already testified to you, and it's
17  very clear.
18      MS. SHERVEN:  Counselor, I mean
19  the record you're making is just
20  completely inappropriate.
21      MR. YOUNG:  No it's very
22  appropriate.  You keep asking him the
23  same questions.  What don't you
24  understand about the previous answer?
25  I'm not going to let him answer the

47

M. GOMEZ

1
2  questions three and four times,
3  because you know that makes a very
4  muddy record.
5      MS. SHERVEN:  Is there some
6  reason why you cannot allow me to
7  finish speaking before you interrupt
8  me?
9      MR. YOUNG:  No.  You had
10  finished speaking.
11      MS. SHERVEN:  No, I had not.
12      MR. YOUNG:  Go ahead.
13      MS. SHERVEN:  I'm trying to ask
14  very specific questions.
15      MR. YOUNG:  But you're asking
16  them again and again.
17      MS. SHERVEN:  Okay, apparently
18  you cannot stop from interrupting me.
19  Do I need to call the Judge and tell
20  the Judge that you're interrupting
21  me.
22      MR. YOUNG:  If you feel the
23  need to call the Judge, and we need
24  to get somebody here to sit here, so
25  you don't ask the same question three

48

M. GOMEZ

1
2  and four times, that's up to you.
3      But I'm giving you a hundred
4  percent latitude to ask the
5  questions.  But my concern is if you
6  keep asking him, well, I don't
7  understand why this.  I don't
8  understand this.  If you don't
9  understand it, I don't know what to
10  say, but I'm letting him answer all
11  of your questions but just not
12  multiple times.
13      MS. SHERVEN:  I would
14  appreciate it again if you do not
15  interrupt me in the future.  I can't
16  see anything that's more
17  disrespectful than the fact that you
18  keep interrupting me while I'm trying
19  to speak or ask the question.  So, I
20  would please ask you to stop
21  interrupting me.
22      MR. YOUNG:  Are you finished?
23      MS. SHERVEN:  Yes, I'm
24  finished.
25      MR. YOUNG:  Okay.  I have a

49

M. GOMEZ

1
2 right to make my objections on the
3 record whether they are to form or
  asked and answered, and I will
  continue to do that.
6     MS. SHERVEN:  And I'm not
7 stopping you from making your
8 objection.  I do not appreciate
9 speaking objections or the fact that
10 you are interrupting me.  That's what
11 I'm asking you not to do.
12     MR. YOUNG:  Continue.
13     Q.  During the time that Detective
14 Quinoy is running towards you in the manner
15 that you've described, do you move at all
16 from the position that you've described that
17 you were in, that being with your hands up
18 against your vehicle facing the vehicle?
19     A.  No.  Once he say put your hands
20 up on the car and turnaround, and that's
21 exactly what I did.  Then what I did -- he
22 came and he banged me, pushed me.
23     MR. YOUNG:  You've answered the
24 question.
25     Q.  My question though was just if

50

M. GOMEZ

1
2 you moved at all during that time that he's
3 coming towards you, but you had had your
4 hands --
5     A.  -- no, when I moved he was
6 already on top of me.  You know, I don't
7 know if he was running.
8     MR. YOUNG:  Okay, you've
9     answered the question I think.  Has
10     he answered the question, Counselor.
11     Q.  Is it your testimony that you
12 did not move --
13     A.  -- no, I did not move.
14     MR. YOUNG:  Wait.  Wait.  She's
15     not finished.
16     Q.  Is it your testimony that you
17 did not move until the time that you felt
18 contact from Detective Quinoy?
19     A.  Yes.
20     Q.  Where did you physically feel
21 contact?
22     A.  Well, when he first came in, he
23 banged me against -- he banged me, pushed me
24 like tapped me right against the car, like,
25 boom.

51

M. GOMEZ

1
2     Q.  I'm going to stop you, though,
3 just so that you can tell us with what
4 portion of his body he pushed you or banged
5 you as you described it?
6     A.  I have no idea.  I guess you
7 know when you tried to tackle somebody and
8 you push somebody, I guess it was both
9 hands.  I know he pushed me.  I couldn't
10 exactly tell you what hand or what elbow.
11     Q.  Did you see that?
12     A.  I felt it.  He banged me.
13     Q.  My question, though, is if you
14 saw it?  Saw how he pushed you against the
15 car?
16     A.  No, I couldn't see it, because
17 I was facing the other way.  I had my head
18 turned.
19     MR. YOUNG:  That's fine.
20     You've already said that.
21     Q.  Does your body at that time
22 make contact with your car?
23     A.  Yes.
24     Q.  What portion of your body makes
25 contact with the car?

52

M. GOMEZ

1
2     A.  My chest and my right part of
3 the elbow because --
4     Q.  Your tapping your shoulder, but
5 you said elbow.
6     A.  Not my elbow, my shoulder.
7 Sorry about that.  Getting kind of nervous
8 here.  Got to relax.
9     Q.  So, your chest and your right
10 shoulder make contact with your car, your
11 truck excuse me?
12     A.  Yes.
13     Q.  At that point in time, did you
14 say anything?
15     A.  Yes.
16     Q.  What did you say?
17     A.  Hey, I thought we were going to
18 talk.  I thought that you brought me here,
19 because we were going to talk.  That's it.
20     Q.  Did he say anything in
21 response?
22     A.  He was cursing here and there.
23 He was yelling.  He was yelling.  He was
24 really making a -- I can't really tell you
25 exact words, but I know he was cursing

53

M. GOMEZ

1
2  saying. First of all, when he came to
3  arrest me, put your fucking hands up on the
4  car. Turn around. Don't fucking move.
5           I slightly turned my head, just
6  to turn, I thought we were going to talk.
7  That's when, boom, he hit me with that -- I
8  don't know if he had the cuffs in the hands,
9  but I know it was something hard. He hit me
10 with his left-hand in the left side of the
11 head.
12          MR. YOUNG: All right, now,
13     look, this is the fourth time that
14     we've gone over this. So, I don't
15     know whose fault it is, whether the
16     question's being asked repeatedly or
17     you're just offering additional
18     information, but that's the fourth
19     time that you were hit in the left
20     side of your face with something
21     hard.
22          So, I'm going to just instruct
23     you to just answer her questions and
24     don't continue to elaborate.
25          THE WITNESS: Right, okay.

54

M. GOMEZ

1
2     Sorry.
3     Q.  What part of the left side of
4  your head did Detective Quinoy make contact
5  with? Can you describe was it near your
6  ear, is it closer to your face? Can you
7  describe that the best that you can?
8     A.  A little bit over the side of
9  my head, here.
10    Q.  You're indicating above your
11 left ear?
12    A.  Above the left ear, yes, right.
13    Q.  What happened next after you
14 feel the hit in the left side of your head,
15 what's the next thing that happens?
16    A.  I turned around, and I defended
17 myself.
18    Q.  When you say you turned around,
19 did you turn your whole body around or just
20 your head or something else?
21    A.  I turned around a little bit.
22 after I got banged against the vehicle. I
23 got hit on the head. I was being assaulted.
24 So, I decided I needed to defend myself.
25    Q.  What did you do to defend

55

M. GOMEZ

1
2  yourself?
3     A.  I took a few punches.
4     Q.  How many punches,
5  approximately?
6     A.  About two or three.
7     Q.  Who did you throw the punches
8  at; Detective Quinoy or Officer Gasker?
9     A.  No, Detective Quinoy. I never
10 touched Officer Gasker. Right.
11    Q.  Did you physically make contact
12 with Detective Quinoy?
13    A.  I believe I did, yes.
14    Q.  On which portions of his body
15 did you make contact?
16    A.  I believe it was somewhere
17 around the left part of the forehead or the
18 left eye, something like that. I'm not
19 sure.
20    Q.  Did you make contact with any
21 other part of his body?
22    A.  No, not that I remember. No.
23    MR. YOUNG: You know can I just
24     take a two-minute break here. I just
25     have to make a phone call.

56

M. GOMEZ

1
2          (Whereupon, a recess was
3     taken.)
4          MR. YOUNG: Again, to continue
5     my earlier comment about the scope of
6     the deposition, here. Counselor's
7     familiar with the rules. This is a
8     Qualified Immunity Deposition, and it
9     is here for a limited purpose.
10          We've been here for it's 11:15.
11     This was scheduled to start at 10:00
12     o'clock, and we're nowhere near the
13     issues for why we are here.
14          I ask Counselor to restrict her
15     questions to the purpose of the
16     deposition. In the event that she
17     continues to go beyond that scope,
18     which I think she is doing right now,
19     at the appropriate time we will seek
20     sanctions, and we will also seek to
21     have that portion of this record
22     which we has been improperly entered
23     into stricken for all purposes.
24     Okay, let's go.
25          MS. SHERVEN: Counselor, the

57

M. GOMEZ

2 record does speak for itself, and we
3 are entitled, the Defendants are
4 entitled to ask the appropriate
5 questions that are being asked today
6 as to the circumstances surrounding
7 the arrest at issue, and the
8 deposition is a proper deposition
9 pursuant to the Qualified Immunity ea
10 purpose today.
11    Q.    At the time that you struck
12 Detective Quinoy in the manner you
13 described, did your wife say anything?
14    A.    Yes.  She was already yelling.
15    Q.    What was she saying?
16    A.    No.  Stop.  Things like that.
17 I can't actually.  I can't, but I know she
18 was yelling.
19    Q.    Did Officer Gasker say anything
20 during that time?
21    A.    No, not I don't remember
22 hearing Officer Gasker saying anything at
23 all, but my wife was yelling.
24    Q.    At this point in time, did you
25 see anyone else in the vicinity whether a

58

M. GOMEZ

2 police officer or civilian?
3    A.    No, not that I know.  There
4 might have been other people, but at that
5 time I don't remember seeing.
6    MR. YOUNG:  Well, her question
7 is did you see the other people.  You
8 said, no.
9    A.    Okay, no.
10    Q.    What happens next?  I'm talking
11 about after the time where you've described
12 that you were throwing punches at Detective
13 Quinoy.  What happens next?
14    MR. YOUNG:  I'm going to object
15 to the form of the question.  I ask
16 that you rephrase it.  Throwing
17 punches at Detective Quinoy is your
18 own terms.  He did not use those
19 terms.  He did say that he did punch
20 Officer Quinoy two or three times.
21    MS. SHERVEN:  Counselor, with
22 all due respect, you're again making
23 speaking objections.  You're free to
24    --
25    MR. YOUNG:  You're putting

59

M. GOMEZ

2 words in his mouth.
3    MS. SHERVEN:  No.  I'm not.  I
4 was using the same language that he
5 had used; however, your objections
6 are inappropriate.  If you want to
7 say form objection, fine.  I'll
8 rephrase the question.
9    MR. YOUNG:  Form objection.
10    MS. SHERVEN:  But to go into
11 detail about the question and in the
12 manner in which I'm phrasing it, I
13 object to the way in which you are
14 objecting.
15    MR. YOUNG:  Form objection.
16    Q.    What happened next?
17    A.    Well, I was defending myself
18 from the assault by Detective Quinoy, and I
19 did hit with no more than two punches, three
20 at the most.  And he tackled me down.  We
21 started struggling, and at that time I heard
22 Detective Quinoy say tase him.  That's it.
23    Q.    When you say he tackled you
24 down, can you describe in the manner in
25 which this --

60

M. GOMEZ

2    A.    -- well, Counselor, we were
3 wrestling.  I can't describe the manner
4 which arm was holding what.  We were both
5 grabbing each other very hard, struggling.
6 We fell to the floor.  And, no, wait a
7 minute.  We were still struggling on the
8 car, and he said tase him.  And I got my
9 first tase while I was standing up.  That
10 buckled my legs, and I fell.  I got tased in
11 the back of the neck.
12    Q.    Following the time when you
13 said that you were defending yourself, you
14 initially said that he tackled you, and then
15 you said that you were wrestling.  Just so
16 the record is clear what happened next after
17 you were defending yourself in the manner
18 that you described?
19    MR. YOUNG:  Wait a minute.  I
20 mean we're going over the same thing.
21 We can read it back, because you're
22 asking the same question again and
23 again.
24    MS. SHERVEN:  No.  I'm trying
25 to be very clear as to what happened

61

M. GOMEZ

2    in which order of events, and it's
3    not clear.
4        Q.   So, I'm asking just what
5    happened, just tell me what happened
6    immediately after you were punching or
7    defending yourself in the way you've
8    described?  What happened then, and then
9    we'll take it frame by frame, so that we can
10   understand that?
11           MR. YOUNG:  Can we go back
12       several questions and I think the
13       same question was asked.  I just want
14       to see what the answer is in case
15       it's not on the record, maybe I
16       missed something.
17           (Whereupon, the reporter read
18       back the requested material.)
19       Q.   When you said that Detective
20   Quinoy tackled you, did you physically fall
21   to the ground at that time?
22       A.   Yes.
23       Q.   What was it that actually
24   caused you to fall to the ground at that
25   time; his tackling you as you described or

62

M. GOMEZ

1  something else?
2        A.   Well, he's tackling and also
3    the taser I got, because we were struggling
4    that's when I feel the electricity behind my
5    neck, and I fell.  And I think since I was
6    holding onto him, we both fell at the same
7    time.
8        Q.   Did you see who was holding the
9    taser at that time?
10       A.   It was Officer Gasker.
11       Q.   Did Officer Gasker say anything
12   at that point in time?
13       A.   No, not that I remember.  No,
14   not that I recall, no.
15       Q.   Did you say anything to Officer
16   Gasker at that time?
17       A.   No.
18       Q.   Did you say anything at that
19   moment in time?
20           MR. YOUNG:  At the moment he
21       was being tased?
22       A.   No.
23           MR. YOUNG:  Go ahead.
24           MS. SHERVEN:  Again, you can't

63

M. GOMEZ

2    keep making the speaking objections.
3    I mean I'm trying to be clear.
4            MR. YOUNG:  I'm trying to
5        understand your question.  You said
6        at that time.
7        Q.   At the time that you were
8    wrestling with Officer Quinoy until the time
9    that you fell to the ground, did you say
10   anything?
11       A.   No, not that I can remember.  I
12   heard in the background my wife yelling and
13   screaming.
14           MR. YOUNG:  Wait a minute.  Did
15       you say anything?
16       A.   No.  Sorry.
17       Q.   Did your wife say anything
18   during that time period that we're
19   discussing?
20       A.   Yes.
21       Q.   What did your wife say?
22       A.   Stop.  Please.  Don't.  No.
23   Stop.  No.  No.  Things like that.  You
24   know, yelling.  She was actually yelling
25   from the beginning.

64

M. GOMEZ

2        Q.   During the time that you were
3    wrestling like you described with Detective
4    Quinoy, did he strike any portion of your
5    body?
6        A.   I have to say, yes.
7        Q.   What portions of your body?
8        A.   I can't really remember now,
9    Counsel, but I know I was stricken.  I
10   almost got killed after that, what came
11   after that.
12           MS. SHERVEN:  Move to strike
13       the portions that were not
14       responsive.
15           MR. YOUNG:  Concentrate on the
16       question.
17       A.   I can't remember what portions
18   of the body.  I know that he definitely hit
19   me, yes.
20       Q.   Did he hit you with his hands
21   or some other part of his body?
22       A.   At that time, with his hands.
23   And I think he had the cuffs in his hands.
24   I felt something very hard.
25       Q.   On what portion of your body

65

M. GOMEZ

1 did he make contact with at this point in
2
3 time?
4      A.   I can't recall.  We were
5 struggling.  It's very hard for me to go
6 back now and describe exactly.  I can't
7 recall anyhow.
8      Q.   Well, you just said a second
9 ago that you thought he had the cuffs in his
10 hands because you felt something hard.  On
11 what part of your body did you feel that?
12           MR. YOUNG:  Could you read back
13      the last question, because again
14      we're not going to go through another
15      50-h like we did the last time.
16      We're repeating questions over and
17      over.  If you don't like the answer,
18      you keep asking it.
19           (Whereupon, the reporter read
20      back the requested material.)
21      Q.   Do you recall what portion of
22 your body you felt a hard object make
23 contact with at that time?
24      A.   At that time, no.
25      Q.   Until the time that you fell

66

M. GOMEZ

1
2 onto the ground, other than the taser that
3 you described that Officer Gasker had, did
4 he physically touch you in any way?
5           MR. YOUNG:  Gasker.
6           MS. SHERVEN:  Gasker.
7      A.   Gasker, not that I know.  I
8 can't really recall.
9           MR. YOUNG:  That's your answer.
10      Q.   When you and Detective Quinoy
11 fell to the ground in the way that you
12 described, were you still wrestling at the
13 time that you landed on the ground.
14      A.   Yes.  I was still defending
15 myself trying to avoid from getting punched.
16      Q.   After you and Detective Quinoy
17 had fallen to the ground, what happened
18 next?
19      A.   I was already on the ground,
20 like, facing down, and I felt some hard
21 kicks, four hard blows in my ribs.
22      Q.   Are you indicating your right
23 side?
24      A.   Yes.
25      Q.   Now, if you're facing towards

67

M. GOMEZ

1
2 the ground, where's Detective Quinoy's body
3 in relation to you?
4      A.   I guess next to me.  To the
5 left, to the right -- I don't remember.
6      Q.   Did you see someone kicking you
7 at that point in time?
8      A.   I felt that.  I think a voice
9 coming in (noise) boom, boom.  I know it
10 wasn't Gasker.  Another officer had come in.
11           MR. YOUNG:  Hold on.  You have
12      to concentrate.  You're going to have
13      to do better.  The question was:  Did
14      you see someone kicking you?  She
15      didn't ask you what you heard.
16      A.   No, I didn't see the kicks.
17           MR. YOUNG:  Fine.  That's your
18      answer.
19      Q.   Do you know, in fact, that they
20 were kicks versus punches?  How do you know
21 that it was someone kicking you as opposed
22 to something else?
23      A.   Because it couldn't be
24 Detective Quinoy, because he was next to me.
25 And we were actually holding onto each other

68

M. GOMEZ

1
2 and I felt the kicks on the right side, and
3 the two, three kicks, hard blows in the
4 ribs, on the right side of my ribs.
5      Q.   Do you know who was kicking
6 you?
7      A.   Officer Ebel.
8      Q.   Before your arrest, did you
9 know Officer Ebel?
10      A.   I seen him in down.
11      Q.   You'd recognized him at some
12 point in time that night?
13           MR. YOUNG:  Hold on.  Objection
14      to the form of the question.  Can you
15      rephrase that.
16      Q.   You said that you had seen him
17 around town.  Did you know him by name at
18 that time?
19      A.   No.  No.
20      Q.   How do you know it was Officer
21 Ebel that was kicking you?
22      A.   I'm trying to give a short
23 answer.
24           MR. YOUNG:  Okay.
25      A.   I know it was Officer Ebel

69

M. GOMEZ

1
2 because at no point in time during the
3 incident I saw Gasker kicking me, so it had
  to be Officer Ebel.
4      Q.   When did you first realize that
5 Officer Ebel had arrived in front of the
6
7 police station?
8      A.   What do you mean in front of
9 the police station?
10     Q.   Well, how did you know that
11 Officer Ebel was there?
12     A.   When I turned around, when we
13 were struggling -- after I got kicked and we
14 were still struggling, and I turned around
15 and I saw him.
16     Q.   Do you know where Officer Ebel
17 came from, whether it was inside the police
18 station or somewhere else?
19     A.   He came from inside the police
20 station.
21     Q.   How do you know that?
22     A.   Well, I didn't actually see him
23 in the police station because I never went
24 inside the police station, but I know he was
25 the desk officer that day.

70

M. GOMEZ

1
2      Q.   How do you know that he was the
3 desk officer, though? Did somebody tell you
4 this? How do you know that Officer Ebel
5 came from inside the police station as
6 opposed to a vehicle or something else?
7      A.   Because there was no other
8 police patrol vehicles in the area at that
9 point. There was no lights going on or
10 anything at all. So, most of them had come
11 from inside the station.
12     Q.   Did anyone tell you, whether it
13 was your wife or someone else, that Officer
14 Ebel came from inside the police station?
15     A.   Actually, I don't recall,
16 Counselor, but I know he came from inside
17 the station.
18     Q.   Do you know how Officer Ebel
19 came to come outside from inside the police
20 station?
   A.   No.
22         MR. YOUNG:  Was that question
23     do you know how he came outside?
24         (Whereupon, the reporter read
25     back the requested material.)

71

M. GOMEZ

1
2      Q.   I'll rephrase the question. Do
3 you know why Officer Ebel came from inside
4 the police station to outside?
5      A.   No.
6      Q.   At the time that you felt the
7 kicks in the way that you described, did you
8 say anything?
9          MR. YOUNG:  As he was being
10     kicked?
11     Q.   At that point in time, did you
12 say anything?
13     A.   It was fast. It was confusing.
14         MR. YOUNG:  Woe, woe, woe, woe.
15     Stop. Stop. Did you say anything
16     when you were being kicked?
17     A.   No.
18     Q.   At that point in time, did you
19 hear anyone saying anything?
20     A.   Yes. Detective Quinoy, hey,
21 hey, hit him. Hit him hear. Hit him there.
22 Detective Quinoy. My wife's yelling and
23 screaming in the background.
24     Q.   Other than Detective Quinoy and
25 your wife, did you hear anyone else say

72

M. GOMEZ

1
2 anything?
3      A.   I think Ebel was saying
4 something. What, I can't remember right
5 now. He was also yelling, you know.
6      Q.   At the point that you turned
7 and you saw Officer Ebel, did you say
8 anything?
9      A.   No, not that I can recall at
10 that point, no.
11     Q.   Did anyone else say anything at
12 that point in time?
13         MR. YOUNG:  As he was turning
14     to look to Ebel?
15     Q.   As you turned and saw Ebel?
16     A.   The only one talking, yelling
17 and screaming was Quinoy yelling, hit this
18 mother fucker here, there. Excuse me, but I
19 got to say what he said. And Ebel was
20 yelling also, and my wife's screaming in the
21 background.
22     Q.   When you turned and saw Officer
23 Ebel, what was he saying?
24     A.   I can't exactly recall,
25 Counselor, because I can't. I know he was

73

M. GOMEZ

1
2  yelling, you know, but I can't recall.
3      Q.   When you first saw Officer
   Ebel, did he have anything in his hands?
4      A.   I think he had the taser, or he
6  had a taser in his hands.
7      Q.   When you turned and saw Officer
8  Ebel, did you see where Officer Gasker was?
9      A.   I can't recall.  I know he was
10 standing next to her, but I can't exact spot
11 I can't remember.
12     Q.   At that time when you saw
13 Officer Ebel was standing close by, did you
14 see anyone elsewhere, whether police officer
15 or civilian?
16         MR. YOUNG:  Other than the
17     individuals?
18     Q.   Other than the individuals that
19 we've been talking about.
20     A.   No, not that I remember.  I
21 couldn't see anybody else.  I was --
22     Q.   When you turned and saw Officer
23 Ebel, what happened next?
24     A.   That's when I said, here, this
25 is a family matter.  Here's my hand, cuff

74

M. GOMEZ

1
2  me.  And I was faced down on the ground cuff
3  me.  This is a family matter.  I didn't
4  commit any crime.  I'm a retired New York
5  City Corrections Officer, but that's it.
6  And --
7      Q.   I'm going to stop you there
8  before you go onto another, before you go
9  onto something else.
10         When you said what you just
11 told us that you described, where were your
12 hands?
13     A.   I had already -- I was faced
14 down on the ground, and I had stand my
15 hands.
16     Q.   You're indicating that you're
17 putting your hands behind your back, right?
18     A.   Right, so they can cuff me.
19         MR. YOUNG:  His hands and his
20     armed stretched out in front of him.
21     A.   Yes, stretched out, yes, and I
22 was stretched out on the ground already.
23     Q.   At that point in time, where
24 was Detective Quinoy?
25     A.   He was there, but I can't

75

M. GOMEZ

1
2  really tell you exactly where.  I have to
3  see a video or something.  He was still
4  punching and kicking during that time, yes.
5      Q.   Was Detective Quinoy still on
6  the ground with you or --
7      A.   No.
8      Q.   -- or had he gotten to his feet
9  at some point in time?
10     A.   No, he was already up.  No, he
11 was already up.
12     Q.   At what point in time did
13 Detective Quinoy get up off of the ground?
14     A.   I can't recall now.  I know it
15 was some --
16     Q.   Where was Officer Gasker at the
17 time that you put your hands back in the
18 manner that you described and said what you
19 told us?
20     A.   He was standing a little bit to
21 the left and a little bit away, two or three
22 feet away from what I saw.  I don't recall,
23 because everything was moving very fast.
24     Q.   At that time, was he making any
25 physical contact with you?

76

M. GOMEZ

1
2      A.   Not that I recall.
3      Q.   At this point in time that
4  you've been talking about, where was Officer
5  Ebel?
6      A.   He was the one that cuffed me,
7  and he was actually -- he was the one that
8  cuffed me.  He was actually pulling my arms
9  like almost up, like, when you're trying to
10 break them.  And at the same time he had his
11 knees on my back and pulling my arms up, all
12 the way up, like, when you're trying to
13 break somebody's arm.
14         MS. SHERVEN:  Move to strike
15     the portion that's not responsive.
16     A.   But that was my answer,
17 Counselor.
18         MR. YOUNG:  That's okay.  It
19     was responsive.
20     Q.   During this time that we've
21 been talking about when you're putting your
22 hands behind your back, was Detective Quinoy
23 making any physical contact with you?
24     A.   Yes.
25     Q.   What portions of your body did

77

M. GOMEZ

1
2  he make physical contact?
3      A.  He was kicking me in my head.
        Q.  Did you see him kick you in the
   head?
6      A.  Yes.  I turned around, and the
7  kicks were coming, and I -- I was already
8  cuffed at that time and on the ground, and I
9  can't do anything about it.
10     Q.  What portion of your head did
11 he actually make contact with?
12     A.  Counselor, I must have got
13 about thirty kicks in the head.  I got kicks
14 in all sides and angles.  I can't really
15 describe exactly at what point what portion
16 I got kicked at.  That was when it first
17 started.
18     Q.  Did Detective Quinoy make any
19 other physical contact with you other than
20 what you've described at this point in time
21 that we've been discussing?
22     A.  At this point in time, no, he
23 was kicking me.
24     Q.  Was he doing anything else?
25         MR. YOUNG:  While he was

78

M. GOMEZ

1
2      kicking him?
3      Q.  At that point in time, what
4  we've been talking about.
5      A.  I don't know if he was doing
6  something else with his hands.  I don't
7  know.  I know I was down, faced down, and I
8  saw his foot coming and kicking.
9      Q.  Did Detective Quinoy say
10 anything while he was kicking you in the way
11 that you've described?
12     A.  He was saying something.  What
13 I can't.  I got to listen to a videotape.  I
14 can't remember now.  He was -- all this
15 yelling and screaming.  My wife screaming on
16 the other side.
17         MR. YOUNG:  She didn't ask you
18     about your wife.
19     A.  You know what I mean.
20         MR. YOUNG:  She didn't ask you
21     about your wife.
22     A.  I can't exactly recall what he
23 was saying, but I know that he was yelling.
24     Q.  Did you hear anyone else
25 yelling or saying anything at that point in

79

M. GOMEZ

1
2  time?
3      A.  Ebel.
4      Q.  What did Officer Ebel say?
5      A.  Like, once again, Counselor, I
6  can't remember exactly what he was saying.
7  Oh, fuck.  I know that I identified that he
8  had my leg.  I had got tasered in my spine
9  quite a few times.  Taser my head.  That's
10 when I was already cuffed.  I was already
11 cuffed on the ground.  I got tased in the
12 temple, and he put his knee on my neck, and
13 he was choking me.  And when I was choking,
14 you tried to move.  It wasn't that I was
15 resisting.  I was trying not to be choked.
16         And I said, I identified myself
17 once again.  This is the family issue.  I
18 didn't commit any crime.  I'm a retired New
19 York City Corrections Officer.  He said,
20 fuck New York City Correction, this is
21 Sleepy Hollow Police.
22         MS. SHERVEN:  Move to strike
23     the portions that were nonresponsive
24     to the question.
25     Q.  Before you had your hands

80

M. GOMEZ

1
2  physically cuffed, how many times did you
3  feel a taser?  I'm talking up until the time
4  you were cuffed not afterwards.
5      A.  I got tased about four or five
6  times, but I would say four, three times,
7  two or three times.
8      Q.  So, two to three times before
9  you were cuffed?
10         MR. YOUNG:  You started four to
11     five, and then you said three to four
12     then.
13     A.  No.  No.  Because it's
14 confusing, because I got tased before and
15 tased a lot after.
16         MR. YOUNG:  The question is
17     before you were cuffed, how many
18     times.
19     Q.  Before you were cuffed, I'm not
20 talking about after?
21     A.  I would say three to four
22 times.  It was definitely more than twice.
23     Q.  Did you see who used the taser
24 during those three to four times?
25     A.  I know the first taser was

81

M. GOMEZ

1
2   Officer Gasker, because he was the only one
3   there, and I was struggling with Detective
4   Quinoy.
5        MR. YOUNG:  We've gone over
6        this already.
7        Q.   Not that portion.  I know you
8   told us that, but the other times, can you
9   tell us who it was that you saw using the
10  taser.
11       MR. YOUNG:  Off the record.
12       I'm confused.
13       (Off-the-record discussion.)
14       Q.   Just so the record is clear,
15  the first taser you felt is while you were
16  standing; is that correct?
17       A.   Yes.
18       Q.   Who was it that used that
19  taser?
20       A.   Officer Gasker.
21       Q.   Now, you've just told us that
22  there were three or four times that you felt
23  the taser before you were cuffed.  Is it
24  fair to say that while you were on the
25  ground, you felt the taser two to three

82

M. GOMEZ

1
2   times?
3        A.   Yes.
4        Q.   Did you see who it was that
5   used the taser during those two to three
6   times while you were on the ground?
7        A.   No, because I was just
8   trying --
9        MR. YOUNG:  No.  No, is the
10       answer.
11       THE WITNESS:  Sorry.
12       Q.   Do you know who used the taser
13  those two to three times?
14       A.   I know that Officer Ebel had a
15  taser in his hand, also, and Officer Gasker
16  had a taser, also, and I guess Officer Ebel
17  was the one that tasered me after that.
18       Q.   Are you referring to in the
19  same time period, or are you referring to
20  now after you were cuffed?  I'm confused.
21       A.   No, we're talking about before
22  I was cuffed.
23       Q.   Before your cuffed?
24       A.   No.  Officer Ebel had a taser
25  in his hands.

83

M. GOMEZ

1
2        Q.   Do you know if he used the
3   taser at that point in time before you were
4   cuffed?
5        A.   No. When I really noticed him
6   tasing me was when I was already cuffed.
7        Q.   We'll talk about that in a
8   minute.  At this time while you're on the
9   ground before you're cuffed, did you know
10  which officer it was that used the taser?
11       A.   No.
12       Q.   At any point in time did you
13  see Detective Quinoy with a taser?  I mean
14  any point in time before or after you were
15  cuffed?
16       A.   He probably had the taser, and
17  I don't recall seeing him with the taser.
18       Q.   Before you were handcuffed, did
19  you see anyone else in the vicinity other
20  than the people you've already told us
21  about?
22       A.   At that time almost to the
23  point, I know that I heard voices.  I
24  couldn't exactly tell you who it was, but I
25  know they're was all the people already

84

M. GOMEZ

1
2   there in the area, in the vicinity on the
3   sidewalks looking at that.
4        Q.   Were there any other police
5   officers in the area before you were cuffed
6   other than the three that you've already
7   told us about?
8        A.   No.
9        Q.   Now, at the point that you were
10  handcuffed you told us that you felt a taser
11  after you were cuffed.  How many times did
12  you feel a taser after you were handcuffed?
13       MR. YOUNG:  This is total until
14       they stopped?
15       Q.   Total times after you were
16  handcuffed?
17       A.   After, this is after?
18       Q.   After.
19       A.   I believe I got tasered after
20  more than before I was cuffed.  And I got
21  tasered about seven to eight times,
22  approximately, nine times.
23       Q.   Did you see who used the taser
24  any of those times after you were
25  handcuffed?

85

M. GOMEZ

2 A. Yes. I know definitely I saw
3 Officer Ebel. He was the one that tased me
4 in my back, in the spine. And the one in
5 the sides of the temple, I couldn't recall
6 because I was looking down, and I was
7 getting kicked on this side, and they put
8 the taser at the same time as I was getting
9 kicked.
10 MS. SHERVEN: I move to strike
11 the portions that are nonresponsive.
12 Q. I'm just asking you who you
13 saw. Did you see anyone else use a taser
14 after you were handcuffed other than Officer
15 Ebel?
16 A. I know Detective Quinoy had a
17 taser, also, but I just can't, you know, I
18 just can't.
19 Q. Did you see anyone else use a
20 taser at this time period that we've been
21 talking about after you were handcuffed
22 other than Ebel?
23 A. One thing that I want to say is
24 that it was not just Ebel that was tasing
25 me, but from what I recall, yes, Ebel was

86

1 M. GOMEZ

2 the one that I saw, because I was turning
3 and I know I was getting kicked, tased,
4 punched at the same time, so it was hard for
5 me.
6 Q. Right now I'm just asking if
7 you saw anyone else?
8 MR. YOUNG: Did you see anyone
9 tasing you at that moment other than
10 Ebel.
11 A. At that moment, no.
12 Q. Now, I believe you just said,
13 and we can read back the record if
14 necessary, but I believe you just said that
15 you saw Detective Quinoy with a taser; did
16 you say that?
17 A. Yes.
18 Q. At what point in time did you
19 see Detective Quinoy with a taser?
20 A. At the end, I would say the
21 end.
22 Q. Did he use the taser?
23 A. I have no idea. I'm not going
24 to say, yes. I'm not sure.
25 Q. On what portions of your body

87

1 M. GOMEZ

2 did you see Officer Ebel use the taser?
3 This is after you were cuffed.
4 MR. YOUNG: I mean he's already
5 -- you can answer it again but it's
6 on the record.
7 A. On my back.
8 MS. SHERVEN: It wasn't
9 responsive.
10 MR. YOUNG: He said back and
11 spine.
12 A. On my back and my spine, and
13 also I knew that he tased me in the back of
14 the head, because he was the one on top of
15 me. Like squatting on top of me, and I was
16 faced down on the ground cuffed.
17 Q. Do you know if any other police
18 officer used the taser at that point in time
19 other than Officer Ebel? I know you said
20 you saw Officer Ebel. Do you know, though,
21 if any other police officer used the taser
22 after you were handcuffed?
23 MR. YOUNG: Well, hold on.
24 You're asking him for the identity.
25 MS. SHERVEN: Yes, for the

88

1 M. GOMEZ

2 identity.
3 MR. YOUNG: Because he already
4 said somebody from the other side was
5 tasing him.
6 Q. Do you know who?
7 A. No. I did not see him at the
8 time, but I know I was getting tased more
9 than once, so it couldn't be the same person
10 tasing me in two different places.
11 Q. At any point in time did you
12 learn who that person was?
13 A. No.
14 Q. After you were handcuffed other
15 than the taser that you've described, did
16 you see any police officer make physical
17 contact with your body?
18 A. Are you talking about the three
19 officers involved or Detective Gasker.
20 Q. Anyone, anyone, did you see any
21 police officer make contact with you after
22 you were handcuffed other than what you've
23 said about the taser?
24 A. Oh, yes. Quinoy was -- I was
25 faced down, and Quinoy was saying, get this

89

M. GOMEZ

1
2  mother fucker. Hit him. Hit him.
3          And then at one point Ebel
   stood up, okay, and he was kicking down,
   like, when you're trying to break a piece of
6  wood. Then Detective Quinoy was kicking
7  from the top of my head, like, when you're
8  kicking a soccer ball.
9          MS. SHERVEN: I move to strike
10         the portions that were not
11         responsive.
12     Q.   Other than Detective Quinoy or
13 Officer Ebel did you see any other police
14 officer make physical contact with you after
15 you were cuffed and other than the tasers
16 that you described?
17     A.   No.
18     Q.   Where was Officer Gasker during
19 the time that you said that Detective Quinoy
20 and Officer Ebel were kicking you?
21     A.   He was there.
22     Q.   And again he was in the
23 vicinity, but where was he in relation to
24 where you were? Was he close by?
25     A.   Close by. Close by.

90

M. GOMEZ

1
2      Q.   Was he making any physical
3  contact with you?
4      A.   Not that I can recall, no.
5      Q.   Can you approximate for me how
6  much time passed from the time you arrived
7  at the police station, okay, and parked your
8  car, until the time you were handcuffed?
9      A.   Until the time that I was
10 handcuffed. I would say four, four or five
11 minutes, four minutes, five minutes, yeah.
12     Q.   Approximately how much time
13 passed during the time that you were
14 handcuffed and what you've described with
15 the police officers kicking you and using
16 the tasers?
17         MR. YOUNG: Hold on. Let's
18         have an end moment here.
19     Q.   Until it stopped.
20     A.   Until it stopped.
       Q.   Until it stopped.
22     A.   That was longer. I would say
23 that had to be from the time that I was
24 cuffed until everything stopped, it had to
25 be approximately ten minutes or twelve, and

91

M. GOMEZ

1
2  maybe more. I don't know.
3      Q.   During those ten to twelve
4  minutes that you've indicated, where was
5  your wife?
6      A.   God, you asked me that
7  question. I just remembered I was leaving a
8  big part out.
9          During the time that I was on
10 the ground, my wife was yelling and
11 screaming. I saw her like in the back of my
12 eyes running to inside the police station,
13 ask for help. Came back. She did that
14 various times. And at one point, it's very
15 important because I was leaving it out. I
16 don't think what I was thinking about. At
17 one point it was almost during the first
18 after I was already cuffed, I was already
19 cuffed. They had tased my quite a few
20 times. It was almost, like, kind of slowing
21 down, and to the part that he kicked me.
22         So, that he was continued
23 kicking. Then my wife told him, Quinoy,
24 you're going to kill him. So, he turned
25 around. I was faced up looking the other

92

M. GOMEZ

1
2  way, and my wife's car was still running in
3  the middle of the road with the lights on,
4  headlights.
5          He picked up my wife and body
6  slammed her into the car. She feel on her
7  two knees and yell from the pain. And I got
8  up. I don' know what I was thinking. I
9  guess it was seeing this, and I got up again
10 on my knees, and I got up, and I was still
11 cuffed. I said, hey, you mother fucker.
12 She just got surgery a month ago. I
13 remember saying that. And she just got her
14 surgery, big surgery only one month ago.
15         So, then I felt another kick in
16 the back, boom, boom, and one in the back
17 almost on the back of my neck. The first
18 one big blow in the back, and I fell to my
19 knees. And another one in the back of my
20 neck, and I fell to the ground again.
21         When they continued with the
22 second wave of that incident, you know.
23         MS. SHERVEN: I'll move to
24         strike the portions that were not
25         responsive.

93

M. GOMEZ

1
2    Q.   Did you see your wife
3 physically go into the police station?
4    A.   I saw her in the corner of my
5 eye.  She was running.  I didn't know where.
6         After the incident she stated
7 to me that I went two or three times in the
8 station asking for help for whoever was
9 there, the sergeant or --
10    Q.   Did she tell you whether she
11 spoke with someone inside the police
12 station?
13    A.   Yes, she did.
14    Q.   Who did she say she spoke with?
15    A.   Should I say their names?
16         MR. YOUNG:  Okay, again, I
17    think this is all beyond the scope of
18    this deposition, but Counsel will do
19    it at her own peril.
20    A.   She said it was a sergeant
21 there, and I believe it was Sergeant Paul
22 Hood.  I believe.  I'm not sure.  It was a
23 lieutenant there.
24    Q.   Do you know which lieutenant?
25    A.   I don't remember.

94

M. GOMEZ

1
2    Q.   Did your wife tell you what she
3 said when she was inside the police station?
4    A.   Yes.
5    Q.   What did she say?
6    A.   Please, help.  Come outside and
7 help my husband.  He's getting killed.  He's
8 getting killed.  He's going to get killed.
9    Q.   What, if anything, did either
10 of those two police officers that you
11 mentioned say?
12    A.   I have no idea.  I know that
13 she yelled.  She screamed.  She tell them.
14 Then she go and she went back outside
15 running.
16    Q.   Did she tell you if they
17 responded to her in any way?
18    A.   From what she told me they
19 looked at her.  They was just looking at
20 her.  I don't know if any of those two
21 officers ever came out.
22    Q.   Did you see either of those two
23 officers outside of the police station at
24 all that night?
25         MR. YOUNG:  Well, he only

95

M. GOMEZ

1
2 identified one possibly, so he
3 doesn't know who the other one is.
4    Q.   Fine.  Let's talk about the one
5 that you identified Sergeant Hood?
6    A.   I saw Sergeant Hood later
7 during the arrest.  I was already in the
8 precinct.
9    Q.   I'm just talking about outside
10 the precinct?
11    A.   Outside, no.
12    Q.   Did you see anyone that had a
13 lieutenant, some identifying marker as a
14 lieutenant outside the police station that
15 night?
16    A.   No, not that I can recall, no.
17    Q.   Before Detective Quinoy made
18 physical contact with your wife, did he say
19 anything to her?
20    A.   Not that I recall, no.
21    Q.   At any point in time did you
22 see your wife make physical contact or touch
23 in any way Detective Quinoy?
24    A.   No.
25    Q.   Have you spoken with your wife

96

M. GOMEZ

1
2 about the specifics of that moment when she
3 and Detective Quinoy made physical contact?
4    A.   Yes.
5    Q.   Did she ever tell you that she
6 touched Detective Quinoy in any way?
7    A.   Well, yes.  She told me that
8 she tap him in the arm or grab him a little
9 bit, Jose, because we call him Jose.  You're
10 going to kill him.  Please, stop.  You're
11 going to kill him.  He turned around, but I
12 didn't see that part.
13    Q.   Let me just stop you there.
14 I'm just asking about her making contact
15 with him.  You didn't see that happen?
16    A.   I don't recall it basically.
17         MR. YOUNG:  That's his
18    testimony.
19    A.   If I don't even know.  I think
20 she --
21         MR. YOUNG:  -- stop.  Stop.
22    You just said you didn't see it.  You
23    just said she told you she may have
24    tapped him.
25    A.   Yes.

97

M. GOMEZ

1

2      Q.    Did she tell you anything else
3 about how she touched or made physical
4 contact with Detective Quinoy?
5      A.    I think that she did told me,
6 yes, that she held him in the arm, like,
7 this.  Jose, you're going to kill him.
8 Stop.  And then he turned around, picked her
9 up, and body slammed, threw her against the
10 car, you know.
11      Q.    Did you see him physically lift
12 her up off of the ground?
13      A.    Yes.
14      Q.    Did her feet actually leave the
15 ground?
16      A.    Yes.
17      Q.    Where did this happen in
18 relation to where you were physically
19 located, like, how far away?
20      A.    Oh, about --
21           MR. YOUNG:  How far was she
22      lifted or?
23      Q.    No.  No.  How far away were
24 Detective Quinoy and your wife from where
25 you were located?

98

M. GOMEZ

1

2      A.    I was faced down in the ground,
3 but I was looking up at the same time,
4 because they were right in front of me.  Not
5 to the left, not to the right, that happened
6 right --
7      Q.    How far away?
8      A.    About from here, four feet,
9 three feet.
10           MR. YOUNG:  To the end of the
11      table?
12      A.    She came -- no, actually, no.
13 Less than that, because he was in the
14 process of kicking me when she did that.
15 And he was right next to me, so it happened,
16 like, I would say two feet away from me.
17      Q.    Where were Detective Quinoy's
18 hands when he physically picked her up in
19 the manner that you described?
20      A.    Counsel, I can't really -- I
21 know that he picked her up and body slam her
22 against the car.  I can't really tell you if
23 the left hand was up and down.  I can't
24 really remember that.
25      Q.    Were both of his hands on her

99

M. GOMEZ

1

2 body?
3      A.    Yes.  You need, actually you
4 need two hands -- she's not that heavy, but
5 you need actually two hands to pick up
6 ninety pounds.
7           So, he picked her up and push
8 it, like, actually got her like this, and
9 push her against the car, you know.
10      Q.    You're indicating picked her up
11 and push her?
12      A.    Not push her, actually you
13 throw, like, when you throw a basketball the
14 way you push her, right.
15      Q.    Did she come into contact with
16 some other object?
17      A.    Yes, with her car.
18      Q.    How far was her vehicle away
19 from either the area you were or the two to
20 three feet from you where Detective Quinoy
21 and your wife were located?
22           MR. YOUNG:  Wait, let's
23      rephrase that, because you're asking
24      him a distance measured from two
25      different locations.

100

M. GOMEZ

1

2      Q.    Well, whichever way is easier
3 for to you describe it.  Can you approximate
4 for us I guess how far the car was from
5 where you were located if that's easier than
6 the other way?
7      A.    About five feet, five feet,
8 five and a half, around there, four to five
9 feet away, four feet.  I can't really tell
10 you.  I know the car was very close.
11 And five, six, you know, around five, six
12 feet, around there.
13      Q.    So, it was approximately five
14 feet from where you were?
15      A.    Yes, right.
16      Q.    Was the car parked also in
17 front of you?
18      A.    No, it was not parked.
19      Q.    Was the car stopped basically
20 in front of you or within --
21      A.    Right.
22      Q.    -- within your straight line of
23 vision?
24      A.    Right.  I was here.  The car
25 was here right in front of me.

101

M. GOMEZ

2  Q.   Okay.

3  A.   In the street.

    Q.   So, when you were looking up
towards where Detective Quinoy and your wife
6  were, you could also see the car?

7  A.   Yes.

8  Q.   What portions of her body made
9  contact with the car?

10  A.   At that time, I know that she
11  had hit the car.  I didn't know what portion
12  of the body.  I know she fell on her knees.
13  She told me it was -- I'm not even sure now.
14  I know she fell on the ground, and she had
15  bruised ribs.

16  Q.   Did she have any other
17  injuries?

18  A.   Not -- yeah, she had a few knee
19  scrape, a couple of scraped knees and elbows
20  where she fell to the ground.

21  Q.   Did you see any other police
22  officer make physical contact with your wife
23  at any point in time during this evening?

24  A.   No.  No.

25  Q.   Did your wife ever tell you

102

M. GOMEZ

2  whether she touched or made contact with any
3  other police officer other than Detective
4  Quinoy?

5  A.   No.  She didn't make any
6  contact with any other police officer.

7  Q.   From the time you were
8  handcuffed until the time that this came to
9  an end, did you see any other police
10  officers other than the ones that you've
11  told us arrive in the area?

12  MR. YOUNG:  Now.  When you say
13  an end, do you mean when the last
14  blow was thrown?

15  MS. SHERVEN:  Yes.  That's what
16  he described earlier for the
17  timeframe.

18  MR. YOUNG:  Okay.

19  A.   After my wife got thrown in the
20  car, I turned around.  I fell back.  I got
21  up.  I fell back to the ground.  They
22  started the same thing again.  The same part
23  of kicking, and so at this time, I fell
24  facing this way instead of facing the car.
25  Because after I got hit, I fell the other

103

M. GOMEZ

2  way, and I saw there was already a couple of
3  the police officers from Sleepy Hollow.

4  I think at the end it was a
5  couple Police Officer Michael Hayes and
6  Police Officer Richard D'Allesandro.

7  Q.   You knew both of them by name
8  at that time?

9  A.   Yes.  Yes.

10  Q.   Did either of them during this
11  time period that we've been talking about
12  ever make physical contact with you?

13  A.   No.

14  Q.   Did you see if either of them
15  had anything in their hands?

16  A.   No.  I can't recall if they
17  did.  I couldn't pay attention to that, no.

18  Q.   After Detective Quinoy threw
19  your wife in the way that you described,
20  where did you feel or see physical contact
21  on yourself?

22  A.   Oh, I got up, and I felt one
23  kick, hard kick in the back in the middle of
24  my back, and I fell.  You know, fell on my
25  knees, because I was on my knees, but I was

104

M. GOMEZ

2  still, like, when you're praying.

3  MR. YOUNG:  Handcuffed.

4  A.   And then I felt another kick
5  right behind my neck, and that knocked me
6  down to the ground.

7  Q.   Did you see who kicked you in
8  the back?

9  A.   No, I did not.  No, it was from
10  behind.

11  Q.   Did you see who kicked you in
12  the head, or, sorry, did you say in the back
13  of the neck?

14  A.   Yeah.

15  Q.   Did you see who kicked you in
16  the back of the neck?

17  A.   No.  It was actually like boom,
18  boom, simultaneously right next to each
19  other, so I don't know.

20  Q.   Do you know even if you didn't
21  see, do you know which police officer it may
22  have been that kicked you the way that you
23  just described?

24  A.   Well, the only one that I
25  actually saw kicking me and --

105

M. GOMEZ

1
2      MR. YOUNG:  Now, again, this is
3  after your wife was thrown.
4      A.   Yeah.  I saw Ebel and Detective
5  Quinoy.  Should I say something else?  At no
6  point that I can remember in the point in
7  time I ever saw Officer Gasker kicking me
8  and not that I remember.
9      Q.   Approximately from the time
10 where your body was positioned facing away
11 from the car in the way you described, how
12 much time passed until this all came to an
13 end?
14      A.   It was not too long after that.
15 After that, it was pretty much almost over.
16 I fell in and, I felt I know the knee right
17 on my neck, it was actually choking me.  And
18 then I look up, and you know I'm not trying
19 to be a melodramatic, but I was almost
20 passing out in the street.
21      And then I see a lot of lights,
22 and it was a bunch of lights at that time.
23 Then that's when I noticed because I heard
24 all the voices, and I was down with the knee
25 into my neck.  And when they picked me up,

106

M. GOMEZ

1
2  they said, stop.  I heard some other voices.
3  It was the Tarrytown Police Department
4  responded.  They saved my life.
5      MS. SHERVEN:  Move to strike
6      that portion as nonresponsive.
7      Q.   Did you see who the individual
8  was whose knee you felt on your neck?
9      A.   I'm not sure, but I think that
10 was Officer Ebel, because Quinoy was still
11 kicking me when the Tarrytown Police
12 arrived.  He was still kicking my head.
13      Q.   Did you say anything to any of
14 the police officers from the time that your
15 wife was thrown in the manner that you've
16 described until the time this came to an
17 end?
18      MR. YOUNG:  He's already
19      testified to that.  He said she just
20      had an operation?
21      Q.   Other than that, did you say
22 anything else that was after?
23      A.   No.  I was actually yelling
24 because when they put the taser in my head
25 that was the worst in my life, worst feeling

107

M. GOMEZ

1
2  in my life.  I heard my brain bouncing
3  inside my skull, and I was just yelling.
4  You know, I don't usually yell, but I had
5  to, you know.
6      MS. SHERVEN:  I move to strike
7      the portions that were nonresponsive.
8      Q.   From the time after your wife
9  was thrown so that you're facing in the
10 other direction away from the car, was a
11 taser used?
12      A.   Yes.
13      Q.   Did you see who used the taser
14 at that point in time?
15      A.   No.
16      Q.   Where on your body was it used?
17      A.   On the head again, on the head,
18 and one more time, one last time in the head
19 and a couple of times in the back.
20      Q.   Did you see who it was who used
21 the taser in your back at that time?
22      A.   No.  I was faced down, and I
23 was getting kicked at the same time.  So, I
24 was faced down, and moving my head, and I
25 had the pressure on my back.  And I had Ebel

108

M. GOMEZ

1
2  right on top of my back.  I couldn't move.
3      Q.   During this time period that
4  we've been talking about, did any of the
5  police officers say anything?
6      MR. YOUNG:  During which time
7      period?
8      Q.   After what you told us about
9  your wife being thrown, did any of the
10 police officers say anything?
11      A.   Say anything about?
12      Q.   About anything.  Did they say
13 anything?
14      A.   Not that I know.  It was a lot
15 of really voices and yelling and screaming,
16 so all the police officers in the area I
17 think -- so, I heard so much commotion, I
18 can't exactly pinpoint who was saying what.
19      Q.   Other than what you've already
20 told us about where you told us that you
21 punched Detective Quinoy, did you make any
22 physical contact with any other police
23 officers?
24      A.   No.
25      Q.   Did you attempt to make any

109

M. GOMEZ

1  physical contact with any of the other
2  police officers other than what you've
3  already told us about involving Detective
   Quinoy?
6      A.   The only thing I attempt was
7  avoid from getting hit from Officer Ebel.  I
8  was just moving, and you know when I was
9  getting choked, it's a natural response that
10 your legs start kicking.  That's the only
11 thing that I was doing.
12     Q.   When you said that your legs
13 started kicking, was that near the very end?
14     A.   Near the end, yes, yes.
15     Q.   Were you kicking in any
16 specific direction?
17     A.   No.  You know, like, when
18 you're kicking, not kicking at -- just
19 kicking back, because I had it was Ebel on
20 top of me.  And basically I was just trying
21 not really, I was just trying to move,
22 because I was getting choked.  Not because I
23 was trying to resist, Counsel, it was just
24 trying to -- it was very painful and very
25 uncomfortable.

110

M. GOMEZ

1
2      Q.   You told us that you saw police
3  lights?
4      A.   Yes.
5      Q.   Do you know if those were
6  Tarrytown Police lights or Sleepy Hollow
7  cars or both?
8      A.   There was Tarrytown, and
9  Tarrytown Police cars and Sleepy Hollow
10 police cars.
11     Q.   Do you know any of the
12 Tarrytown police officers who responded by
13 name?
14     A.   Do I know them personally?
15     Q.   Do you know them by name,
16 whether you know them?
17     A.   Oh, yes.  I remember one
18 Sergeant Daily, and I can't remember the
19 other police officer's name.  It was about
20 two or three of them.  No, three or four.
21     Q.   The other two or three were
22 regular police officers as far as you know
23 versus sergeants or lieutenants?
24     A.   I believe so, yes.  I'm not
25 quite sure.

111

M. GOMEZ

1
2      Q.   Do you know which police
3  officers arrived in the Sleepy Hollow police
4  vehicle?
5      A.   I guess it had to be Richard
6  D'Allesandro, Officer D'Allesandro and
7  Officer Michael Hayes, because they were not
8  there during the start or the middle of the
9  incident.  I saw them at the middle to the
10 end.
11     Q.   Did you see them actually
12 arrive in the vehicle, or are you making
13 that connection because you saw them at the
14 end?
15     A.   No.  I'm making that
16 connection.  I didn't see.
17     Q.   Did there come a point in time
18 when you were placed inside of a police car?
19     A.   Yes.
20     Q.   Up until that time other than
21 the police officers you've already told us
22 about, those from Tarrytown and those from
23 Sleepy Hollow, did you see any other police
24 officers?
25     A.   No.

112

M. GOMEZ

1
2      Q.   Just so we're clear, what you
3  told us already Detective Quinoy, Officer
4  Ebel, Officer Gasker, the three to four
5  Tarrytown police officers and then Officer
6  Hayes and Officer D'Allesandro; is that
7  correct?
8      A.   Yes.
9      Q.   Anyone else?
10     A.   Not that I can recall, no.
11     Q.   Who placed you into the police
12 vehicle?
13     A.   I was picked up either by
14 Officer Hayes and D'Allesandro, and they
15 took me to the police vehicle.
16     Q.   How did they pick you up?
17     A.   Well, I guess by the arms
18 because I couldn't walk.  I was basically --
19 I was, I couldn't hardly walk.  So they took
20 me to the police vehicle.
21     Q.   Did they physically carry you?
22     A.   No, not carry.  No.  No.  I was
23 basically able to walk by myself, but I was
24 almost like -- what do you call that?  When
25 you put your arms around and need.

113

M. GOMEZ

1
2  MR. YOUNG:  They assisted you?
3     A.  Yeah, assisted me.  That's a
better word.  Instead of picked up that
means the whole body, right, no.
6     Q.  But your feet were touching the
7 ground?
8     A.  Yeah.  It took a little while
9 for me to be able to walk, because they just
10 helped me up.  And at the time, the incident
11 had already stopped.  Detective Quinoy was
12 talking to the Tarrytown Police, and was
13 talking to, and it was all the lines and all
14 commotion.
15     MR. YOUNG:  Hold on.  The
16     question was:  Who helped you into
17     the police car.
18     A.  I believe it was -- I know I
19 was actually assisted by underneath the arm
20 they picked me up.
21     Q.  That was by Officer Hayes and
22 Officer D'Allesandro?
23     A.  Yes, right, I'm pretty sure it
24 was them, too.
25     MR. YOUNG:  Okay, that's your

114

M. GOMEZ

1
2 answer.
3     A.  Yeah.
4     Q.  Did they physically place you
5 into a police vehicle?
6     A.  More or less, I couldn't say
7 they physically.  You know, by that time I
8 was, it's okay, okay, it's all right.  Like
9 I was trying to actually speak and do
10 something for myself.
11     And actually I was placed
12 inside of the vehicle.  The patrol car had
13 the door open, and Richard D'Allesandro was
14 standing next to the door.  Officer Quinoy
15 started approaching giving Richard
16 D'Allesandro directions.
17     Q.  I'm going to stop you right
18 there, because I don't have a question as to
19 what happened next.
20     A.  Okay.  Sorry.
21     Q.  That's okay.  Were you placed
22 or did you sit into the back of the patrol
23 car?
24     A.  The back, yes, where the
25 prisoners go.

115

M. GOMEZ

1
2     Q.  Did Officer Hayes or Officer
3 D'Allesandro say anything to you during the
4 time that they assisted you to the car to
5 the police car?
6     A.  No, not that I can recall.  No.
7 No.
8     Q.  Did you say anything to them
9 during that time period?
10     A.  I don't think so.  I was just
11 trying to look around.
12     Q.  Where was your wife at that
13 time?
14     A.  I guess she was still there and
15 around that area.  I couldn't.  At the very
16 end, I couldn't place her.  You know, but
17 she was there.  Because at that time, there
18 was a lot of people in the streets.
19     Q.  Did you recognize any of the
20 people in the streets?
21     A.  I was kind of, you know, I was
22 almost passed out.  I couldn't really
23 recognize, you know.
24     MS. SHERVEN:  I move to strike
25     the portion that's not responsive.

116

M. GOMEZ

1
2     Q.  When you got into the police
3 car, you said that Officer D'Allesandro was
4 standing next to the car; is that right?
5     A.  Yes.
6     Q.  What happened next?
7     A.  Well, I think Officer
8 D'Allesandro got assigned to take me around
9 to the precinct to the police station.  He
10 had the door open.  I was sitting in the
11 back seat cuffed.
12     MR. YOUNG:  Indicating arms
13     behind the back.
14     A.  Yes, my arms behind the back,
15 cuffed behind my back.  And Officer
16 D'Allesandro had the door open.  I saw
17 Detective Quinoy yelling some directions to
18 Officer D'Allesandro.  He started
19 approaching the car, and at that point I
20 actually I didn't expect it.  I didn't see
21 it coming.  He kicked me right in the face,
22 which completely knocked me to the other
23 side of the vehicle and I end up lying
24 against the door.
25     Q.  When you say "he" who are you

M. GOMEZ

referring to?

    A.  Detective Quinoy kicked me right on the right side of the face.

    Q.  Other than assisting you to the car in the way that you described, did Officer D'Allesandro make physical contact with you in any way?

    A.  No. No.

    Q.  Other than assisting you to the car, did Officer Hayes make any physical contact with you?

    A.  No.

    MS. SHERVEN:  Let's just take a break.

    (Whereupon, a recess was taken.)

    Q.  Just before Detective Quinoy kicked you in the way you described while you were sitting in the police car did he say anything to anyone?

    A.  Yes. He was giving directions or orders to Officer D'Allesandro.

    Q.  What did he say?

    A.  I have no idea. I was already,

M. GOMEZ

you know, I was feeling pretty bad, and I was cuffed. And when I looked to the left and when I looked to the right, I saw him approaching. He was pointing his fingers giving Officer D'Allesandro direction, and he started getting closer, closer, but I never expected him to do that.

    So, he kicked me. I got knocked out to the other side of the car, and then he slammed the car behind him.

    MS. SHERVEN:  Move to strike the portions that are not responsive.

    Q.  I know you said he was giving Officer D'Allesandro instructions. What leads you to believe that he was giving him instructions?

    A.  Because he's a detective. I mean things going on, and the police officer was standing there. After that, after I got kicked, Officer D'Allesandro got in the driver's seat, and he drove me around the corner, and he took me to the back of the police station.

    Q.  I'm going to stop you there.

M. GOMEZ

Did you hear the content of anything that Detective Quinoy said to Officer D'Allesandro that leads you to believe that he was giving him instructions?

    A.  No. No. I can't actually.

    Q.  During that time period, did you see Officer D'Allesandro do anything?

    A.  What do you mean do anything?

    Q.  Anything. Did he move? Did he do anything whatsoever?

    A.  Well, no, after they placed me in the car, and Officer Hayes went another direction. I don't know. It was so many commotion and people. The one that was standing with the door open was Officer D'Allesandro.

    Q.  From the time that Officer D'Allesandro assisted you into the car and he was standing next to the car and the time that Detective Quinoy came up to the car, did you see Officer D'Allesandro move at all; like, move away from the car? Move in any direction.

    A.  No. No. He was there.

M. GOMEZ

    Q.  Did Officer D'Allesandro say anything in response to Detective Quinoy during that time period?

    A.  They were talking. I can't remember what. I cannot remember.

    MR. YOUNG:  That's it. You've answered the question.

    Q.  Now, you said that Officer Hayes walked away from the car. Where did he go?

    A.  I have no idea.

    Q.  But did he at any time enter the police car?

    A.  No.

    Q.  So, at some point in time Officer D'Allesandro gets into the vehicle and drives the vehicle to the police station, correct?

    A.  Yes.

    Q.  Was anyone else in the car with you and Officer D'Allesandro?

    A.  No.

    Q.  Did you speak to Officer D'Allesandro during anytime that you were